## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JAMES FRASER,

     *Plaintiff*,

v.

THE PENNSYLVANIA STATE
UNIVERSITY, a Pennsylvania
educational institution; DR. ROBERT
PAULSON, an individual, in his official
and individual capacities; DR.
MELISSA ROLLS, an individual, in her
official and individual capacities; DR.
ANDREW READ, an individual, in his
official and individual capacities;
KEYSTONE NANO, INC., a
Pennsylvania business corporation; and
DR. MARK KESTER, an individual, in
his official and individual capacities;

     *Defendants*.

CIVIL ACTION No.

_____

**ELECTRONICALLY FILED**

## COMPLAINT AND JURY DEMAND

NOW COMES, Plaintiff James Fraser ("Mr. Fraser" or "Plaintiff"), by and

through his attorneys, Jason J. Bach, of The Bach Law Firm, LLC, and Michael A.

Farnan, of Farnan Law Office, and files the within Complaint in Civil Action against

The Pennsylvania State University, Dr. Robert Paulson, Dr. Melissa Rolls, Dr.

Andrew Read, Keystone Nano, Inc., and Dr. Mark Kester (collectively,

"Defendants"), and in support thereof avers as follows:

## I.    <u>JURISDICTION AND VENUE</u>

1.    This Court has jurisdiction over this matter under 28 U.S.C. §§ 1331 and 1343(3) because at least one of Mr. Fraser's claims raises a federal (civil rights) question.

2.    This Court has supplemental jurisdiction over Mr. Fraser's other, non-federal question claims under 28 U.S.C. § 1367 because those claims are both related to Mr. Fraser's federal claims and part of the same case or controversy.

3.    This Court further has diversity jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a), insofar as the amount in controversy exceeds $75,000 and the Plaintiff's domiciliary state is not shared with any of the Defendants.

4.    Venue in this District is proper under 28 U.S.C. § 1391(a).

## II.    <u>PARTIES</u>

5.    Plaintiff, Mr. Fraser, is a natural person residing in Suffolk County, Commonwealth of Massachusetts, having an address at 75 St. Alphonsus Street, Apartment 2001, Boston, MA 02120.  At substantially all times relevant hereto, Mr. Fraser was a doctoral candidate in the Molecular, Cellular and Integrative Biosciences Graduate Program (the "<u>Program</u>") at Pennsylvania State University.

6.    Defendant, The Pennsylvania State University ("<u>Penn State</u>" or the "<u>University</u>"), is a public university primarily established and operated in the

Commonwealth of Pennsylvania and has an address for the purposes of service at its principal place of business at 201 Old Main, University Park, PA 16802.

7.      Defendant, Dr. Robert Paulson ("Dr. Paulson"), is an individual who, at all times relevant to the matters herein, was employed by Penn State as a faculty member within its Department of Veterinary and Biomedical Sciences.   Dr. Paulson's address for the purposes of service is 108B Research Building A, University Park, PA 16802.  He is sued in both his individual capacity and official capacity.

8.      Defendant, Dr. Melissa Rolls ("Dr. Rolls"), is an individual who, at all times relevant to the matters herein, was employed by Penn State as a faculty member within its Department of Biochemistry and Molecular Biology.  Dr. Rolls' address for the purposes of service is 118 Huck Life Sciences, University Park, PA 16802.  She is sued in both her individual capacity and official capacity.

9.      Defendant, Dr. Andrew Read ("Dr. Read"), is an individual who, at all times relevant to the matters herein, was employed by Penn State as a faculty member within its Department of Entomology.  Dr. Read's address for the purposes of service is 201 Huck Life Sciences, University Park, PA 16802.  He is sued in both his individual capacity and official capacity.

10.      Defendant, Keystone Nano, Inc. ("Keystone Nano"), is a business corporation primarily established and operated in the Commonwealth of

Pennsylvania, and has an address for the purposes of service at its principal place of business at 158 Roundhill Rd., Boalsburg, PA 16827.

11.     Defendant, Mark Kester, Ph.D. ("Dr. Kester," and, together with Dr. Paulson, Dr. Rolls, and Dr. Read, collectively, the "Individual Defendants"), is an individual, who at all times relevant to the matters herein, was believed to be employed as Chief Technology Officer by Keystone Nano.  Dr. Kester's address for the purposes of service is 158 Roundhill Rd., Boalsburg, PA 16827.  He is sued in both his individual capacity and official capacity.

## III.   FACTS

12.     The basis for this action is the University's wrongful discharge of Mr. Fraser from the Program, in violation of his rights under federal and state law, and the other defendants' involvement in that and other wrongful conduct.

### A.   BACKGROUND ON MR. FRASER'S ACADEMIC AND SCIENTIFIC ACCOMPLISHMENTS, AND HIS INDUCTION INTO THE PENN STATE PROGRAM.

13.     Mr. Fraser matriculated at Penn State in the fall 2014 term to begin his doctoral studies in the Program.

14.     Prior to enrolling in the Program, Mr. Fraser had an extremely impressive academic and scientific background, having worked as a research scientist at Massachusetts General Hospital in Boston, one of the most prestigious

hospitals in the world, and he then worked for a biotech start-up pioneering cutting edge medical science.

15.     Mr. Fraser's achievements prior to enrolling at Penn State included numerous presentations and peer-reviewed publications, including authorship credit for a chapter of Harrison's Manual of Oncology, one of the most prevalent medical textbooks in the country, in addition to numerous other academic awards and accolades.

16.     After enrolling in the Program, Mr. Fraser continued to be recognized for his accomplishments, receiving multiple grant awards and fellowships (including one from the National Institutes of Health), in addition to numerous other academic awards and accolades.

17.     Mr. Fraser accomplished all this despite suffering from chronic hemophilia, an inherited bleeding disorder in which the blood does not clot properly, which required frequent hospital stays and caused him to suffer severe bouts of illness for extended periods of time.

18.     Defendants were well aware of Mr. Fraser's condition during all the time period detailed herein, given that it required no less than three extended hospital stays during his Ph.D. work.

19.     In recognition of his prior accomplishments, Mr. Fraser was inducted into the Program at Penn State with no less than three fellowships.

20.     Mr. Fraser progressed apace through the Program's curricular requirements and passed his Qualifying Examination and Comprehensive Examination on December 17, 2015, and November 21, 2016, respectively, thus beginning his doctoral candidacy.

**B.      MR. FRASER HAD A TURBULENT PRIOR RELATIONSHIP WITH HIS THESIS ADVISOR, DEFENDANT PAULSON, THAT WOULD LEAD TO A LASTING GRUDGE ON PAULSON'S PART.**

21.     Shortly thereafter, Mr. Fraser began working with Dr. Paulson as his thesis advisor.

22.     Pursuant to his thesis work, Mr. Fraser began working in Dr. Paulson's lab at Penn State in or about the summer 2015.

23.     Shortly thereafter, Dr. Paulson began tasking Mr. Fraser with additional responsibilities that were beyond the scope of his fellowships and thesis duties.

24.     These tasks included providing philosophical and material experimental support for other students in the lab in excess of several hundred hours, as well as over a thousand hours of leukemia research work that, upon information and belief, furthered the pecuniary interests of Dr. Paulson and his private business enterprises independent of his work with Penn State.

25.     Mr. Fraser was not paid for this additional work for Dr. Paulson nor was Mr. Fraser given academic credit for the time so expended.

26.     Mr. Fraser believed that Dr. Paulson's conduct constituted a violation of his agreement with Penn State as expressed in the Program's Degree Requirement Handbook, which mandated, among other requirements, that advisors refrain from "assigning duties or activities that are outside students' academic responsibilities or are detrimental to the timely completion of their degrees."

27.     Mr. Fraser further believed that these additional duties constituted a diversion of Penn State resources and his own labor to Dr. Paulson's personal benefit and was concerned that they represented an impermissible conflict of interest between his advisor and the University.

28.     Mr. Fraser felt he had a moral obligation to take action and, despite considerable personal risk, in or about 2017, Mr. Fraser decided to bring his concerns to the attention of Penn State.

29.     Given the scandal that this report likely would create, Mr. Fraser decided to first raise this issue in a discreet manner within the Department.

30.     As such, Mr. Fraser reported his concerns to two of the members of his doctoral committee, Dr. Rolls and Dr. Read.

31.     Citing fear of political reprisal by Dr. Paulson, who was extremely influential within the Department, Dr. Rolls and Dr. Read indicated that they were unwilling or unable to take appropriate action on any of the issues brought to their attention by Mr. Fraser.

32.    This would be the only action taken by Dr. Rolls and Dr. Read until several years later and shortly before Mr. Fraser's thesis defense, when on or about April 19, 2019, Mr. Fraser was called to a meeting with Dr. Rolls and Dr. Read.

33.    At that meeting, Dr. Rolls informed Mr. Fraser that he had two options as to how to proceed in the wake of his reports: (1) give up all his work completed to that point and start his thesis over, presuming he could find a different advisor willing to take him; or (2) file official complaints with the appropriate offices at Penn State.

34.    Given that he had already invested several years of his life in the Program, Mr. Fraser opted for the second option and filed official reports of his concerns with the appropriate Penn State officials.

35.    Penn State began an investigation into Mr. Fraser's claims but subsequently declined to make any findings or take any action against Dr. Paulson.

36.    Upon information and belief, Penn State declined to take action not because there was no merit to Mr. Fraser's claims, but rather because Penn State was more interested in protecting its institutional reputation and that of a prominent professor.

///

**C.     DEFENDANTS BEGAN ENGAGING IN INCREASINGLY RETALIATORY CONDUCT AGAINST MR. FRASER, WHICH MATERIALLY AFFECTED HIS ABILITY TO COMPLY WITH THE REQUIREMENTS OF HIS PH.D. PROGRAM.**

37.     In the aftermath of the filing of Mr. Fraser's complaints with Penn State, Dr. Paulson began engaging in increasingly severe retaliatory conduct against Mr. Fraser.

38.     For example, on or about May 30, 2019, Dr. Paulson informed Mr. Fraser in writing that he intended to withhold Mr. Fraser's stipend support unless he agreed to follow Dr. Paulson's every direction regardless of whether Mr. Fraser believed it presented a conflict of interest with Penn State or a violation of his contract with the University.

39.     Dr. Paulson made this threat despite the fact that Mr. Fraser's stipend was paid from grant funds Dr. Paulson had retained as a direct result of Mr. Fraser's Malaria research.

40.     This forced Mr. Fraser to engage in yet further uncompensated work as he did not wish his work within the scope of the Program to go uncompensated as well.

41.     On another occasion, Dr. Paulson spread accusations amongst the Department that Mr. Fraser had failed to credit him on a conference presentation when this accusation was patently untrue.

42.     This unfounded accusation caused substantial damage to Mr. Fraser's reputation amongst both his peers and professors within the Program.

43.     On several other occasions, Dr. Paulson locked Mr. Fraser out of the lab thereby denying him access to Departmental resources, such as the copier/scanner, and precious time to continue work on experiments for his doctoral research.

44.     In addition to Dr. Paulson, several members of Mr. Fraser's doctoral committee also began taking adverse actions against him, including Drs. Rolls and Read.

45.     For example, in or about the fall 2019 semester, Dr. Rolls demanded that Mr. Fraser turn over confidential data regarding his research despite having no legal or contractual authority to do so, implying that she would involve law enforcement authorities if her demands were not met.

46.     In addition to Penn State faculty, Mr. Fraser's fellow students soon began to take actions adverse to his interests.

47.     For example, in or about the fall 2016 semester, Mr. Fraser became the target of a baseless complaint from a fellow student which resulted in Mr. Fraser being subjected to an extensive Title IX investigation.

48.     Said Title IX investigation would eventually clear Mr. Fraser of any wrongdoing.

10

49.     Despite being cleared of all accusations of Title IX violations, Mr. Fraser was barred from being in the lab at the same time as the accusing student and consequently was forced to alter his own research work and schedule to accommodate the complainant, imposing what amounted to a *de facto* restraining order.

50.     This prohibition was enforced so rigorously that Mr. Fraser was forced to miss his own wife's graduation celebration at Penn State due to the attendance of this complainant.

51.     Upon information and belief, these actions by his fellow students were condoned and orchestrated by Defendant Paulson in retaliation for Mr. Fraser's previous complaints.

52.     As a result of all of the above, Mr. Fraser was treated as a second-class citizen within the Program, which caused him substantial emotional distress.

53.     Nonetheless, Mr. Fraser persisted in his work and continued to advance in his research and on his thesis, despite what was clearly a hostile relationship with his advisor, Dr. Paulson.

54.     While Mr. Fraser was struggling with this marked increase in the hostility of his work environment, it was around this same time that Dr. Paulson began making explicit requests for Mr. Fraser to devote large amounts of his time

away from his thesis work and into other students' projects and leukemia research unrelated to his thesis.

55.     These requests on behalf of Dr. Paulson were explicitly forbidden by the Molecular, Cellular and Integrative Biosciences ("MCIBS") graduate school handbook, the Penn State rules on graduate school fellows, namely GSAD-907,[1] the

---

[1] Providing in relevant part that:

> Fellows/trainees appointed through the University may not be appointed as graduate assistants, accept employment, or render any service to the University during the period of their fellowship/traineeship, except with special permission for training purposes. Fellows/trainees appointed through the University may accept employment/service responsibilities that will further their academic and scholarly training with prior approval from the appointing unit, the fellow/trainees' graduate program head, and (if applicable) the external funding agency.

*Id*.

Program's Degree Requirements Handbook[2] and  the bylaws governing Mr. Fraser's research practices as an NIH T32 fellow.[3]

56.     As a result of this pattern of retaliatory conduct engaged in by Dr. Paulson, and the deliberate inaction of Drs. Rolls and Read in response to Mr. Fraser's complaints, Mr. Fraser was unable to refocus his attention to his thesis work until mid-2019.

57.     Upon information and belief, no other student in Mr. Fraser's lab was similarly tasked with providing uncompensated labor in this manner during their thesis work.

---

[2] Providing in relevant part that:

> Faculty Advisors/Mentors will:
> • provide an environment that is intellectually stimulating, emotionally supportive, safe, and free of harassment;
> • be supportive, equitable, accessible, encouraging, and respectful;
> • recognize and respect the cultural backgrounds of students;
> • be sensitive to the power imbalance in the student-advisor relationship;
> •avoid assigning duties or activities that are outside students' academic responsibilities or are detrimental to the timely completion of their degrees;
> • respect student's needs to allocate their time among competing demands, while maintaining timely progress towards their degree

*Id*. at 5.

[3] Providing in relevant part that fellows "must maintain fulltime work, defined as equal to or greater than 40 hours on my thesis at all times [and] may only work a maximum of 25% (10 hours) on non-thesis related work if permission has been sought and granted." *Id*.

58.     Upon information and belief, where other students were tasked with similar projects, they were given additional monetary compensation or academic credit for time spent thereon, and their work went toward completion of their theses.

59.     Defendants provided no such compensation or credit to Mr. Fraser despite his provision of equivalent work.

60.     Upon information and belief, the conduct undertaken against Mr. Fraser was not motivated by a valid exercise of professional judgment by the Defendants.

61.     Upon information and belief, this course of conduct was punitive in nature, motivated by bad faith and ill will on the part of the Defendants and unrelated to Mr. Fraser's academic performance.

**D.     MR. FRASER'S FIRST DEFENSE OF HIS DOCTORAL THESIS WAS MARKED BY PICAYUNE DEMANDS AND A FALSE ACCUSATION.**

62.     By fall 2019, Mr. Fraser had been working on his thesis for several years and was at the point where he was completing the scientific research necessary to support his conclusions.

63.     In addition to his research coming to a conclusion, Mr. Fraser also was eager to move on from the increasingly hostile work environment that Dr. Paulson's lab had become.

64.     As such, Mr. Fraser began petitioning the members of his Dissertation Committee to schedule a date for his thesis defense.

65. Mr. Fraser felt confident in his chances given that, as of mid-2019, there had been no mention to Mr. Fraser by any Committee member that there was any concern whatsoever regarding Mr. Fraser's performance as a Ph.D. candidate.

66. In addition, at that time, Mr. Fraser had never received any negative feedback from any Committee member regarding Program benchmarks, his selection of courses or personal evaluations.

67. Mr. Fraser was, by all accounts, considered to be an outstanding student who was mere months away from graduating and resuming a career in which he had excelled back in Boston.

68. In the summer 2019 and fall 2019 semesters, Mr. Fraser attended several meetings with Committee members in which they delineated their expectations if Mr. Fraser wished to successfully defend his thesis and be awarded his Ph.D.

69. Mr. Fraser insisted that these requirements be specified with particularity to allay his concerns regarding Dr. Paulson's continuing hostility and unwillingness to render such assistance as would typically be expected of a thesis advisor.

70. The requirements of the Committee included several additional experiments that Mr. Fraser needed to conduct; requests with which Mr. Fraser duly complied.

71.     The Committee also imposed an uncharacteristically short deadline to finalize his thesis and prepare his defense, affording him just one month to do so before his thesis defense date in December 2019.

72.     However, Mr. Fraser was not particularly concerned because, in an email dated November 1, 2019, Dr. Rolls explicitly told Mr. Fraser that, as long as he passed his oral defense at the end of the fall 2019 semester, he would be allowed to turn in his completed thesis in the spring 2020 without issue.

73.     Shortly thereafter, approximately one week before the scheduled date of his thesis defense, Drs. Paulson and Rolls began raising last minute concerns regarding Mr. Fraser's thesis document.

74.     Mr. Fraser was perplexed somewhat by Defendants' criticisms because they related not to the scientific substance of his research, but rather to the level of "polish" of the thesis document itself; a document Dr. Rolls said could be submitted in spring 2020.

75.     Mr. Fraser's confusion was heightened by the fact that he knew of several colleagues that had been awarded their degree with dissertations much less "polished" than his own.

76.     Despite the seemingly arbitrary input of the Committee members, Mr. Fraser worked relentlessly over the following days to implement all of their input and suggested revisions.

16

77.    Then, just two days before the scheduled defense, it was cancelled by the Committee.

78.    The Defendant Committee members instructed Mr. Fraser to go home to Boston over winter break, write a new version of his thesis document, and defend it in the first week of January before the official start to the spring 2020 semester.

79.    Mr. Fraser duly complied with the Committee's request, spending his winter break rewriting and revising the thesis document.

80.    Again, days before the rescheduled thesis defense, Drs. Paulson and Rolls resumed claiming Mr. Fraser's thesis document was insufficiently "polished" to proceed to defense.

81.    At this point, Dr. Read, Mr. Fraser's Committee Chair, stepped in and authorized the defense to proceed because of the significance of the underlying science detailed in the thesis.

82.    Dr. Read wrote Mr. Fraser an email the day before the defense stating that both Drs. Paulson and Rolls were "gunning to fail" him, but Dr. Read assured Mr. Fraser that if he "kept quiet and went with the flow," he would get his degree.

83.    On the day of his defense, Mr. Fraser gave a presentation that was well received by his audience and fielded all questions from attendees.

84.    However, during the subsequent private oral defense before the Committee, proceedings took a decidedly hostile turn.

85.     First, Drs. Paulson and Rolls spent much of the presentation bombarding Mr. Fraser with disruptive questions regarding the life cycle of *Plasmodium* (*i.e.*, the parasites which cause Malaria) despite such questions being largely irrelevant to the topic of Mr. Fraser's thesis.

86.     The Committee then spent much of the remaining time commenting on the lack of a finalized methods section and references list in the thesis document, sections which were not required to be present at the time of the defense and were only absent because of the extensive rewrites mandated by Drs. Paulson and Rolls.

87.     At the conclusion of the defense, the Committee failed Mr. Fraser, ostensibly citing the above criticisms as justification for their decision.

88.     Upon information and belief, a substantial contributing factor to the Committee's decision to fail Mr. Fraser were unsubstantiated claims leveraged by Dr. Paulson that Mr. Fraser had fabricated some of the data supporting his dissertation.

89.     Upon information and belief, Dr. Paulson knew or should have known that these claims were false at the time he made them, and his motivation in doing so arose from actual malice toward Mr. Fraser.

90.     That the Committee's decision was motivated by malice and personal enmity toward Mr. Fraser is further evidenced by that fact that, in addition to failing Mr. Fraser, Defendants also opted to strip him of his stipend and health insurance,

despite being on full notice that Mr. Fraser required frequent hospital stays to treat his Hemophilia.

91.    Upon information and belief, Defendants stripped Mr. Fraser of his stipend and health insurance to force him to quit the Program rather than stand for a second thesis defense.

92.    Needless to say, Mr. Fraser and his family were absolutely devastated by this result.

## IV.   MR. FRASER FULLY COMPLIED WITH THE COMMITTEE'S REQUESTED REVISIONS WHILE PREPARING FOR HIS SECOND THESIS DEFENSE.

93.    On or about January 9, 2020, Mr. Fraser received a letter discussing the outcome of his failed January oral defense.

94.    In said letter, the Committee ostensibly cited the failure of Mr. Fraser to field the largely irrelevant questions regarding the lifecycle of the parasite causing Malaria.

95.    The other sections of the letter discussed stylistic issues with the thesis document itself.

96.    The following day, Mr. Fraser received an email from Dr. Read in which he stated:  "I can assure you that if you address all the issues listed in my letter of Jan 9, you will get the degree."

97.    Based upon this representation from Dr. Read, and the further representations addressed below, Mr. Fraser scrupulously addressed each and every one of the critiques before his second thesis defense.

98.    Shortly thereafter, on or about January 20, 2020, Mr. Fraser received a letter from the associate dean of the Penn State Graduate School, Dean Ades, which formalized the expectations set forth in the January 9 letter.

99.    The letter from the associate dean provided specific procedural steps and guidelines for Mr. Fraser's revisions to his written thesis and how those revisions would be reviewed and commented upon by the Committee members.

100.   With regard to commentary by Committee members on Mr. Fraser's research notes, this letter provided that members would "indicate exactly what type of information should be included."

101.   The letter further provided that the Committee members would only allow the second oral examination to proceed if "the dissertation is found to be complete or requiring only minor revisions."

102.   In the email to Mr. Fraser attaching the January 20 letter, Dean Ades stated as follows: "Your committee, the graduate program in MCIBS, and the Graduate School are confident you can achieve a positive outcome if the items in the attached memo are accomplished as outlined."

103.   In   conjunction,   Mr.   Fraser   reasonably   interpreted   these communications as assuring him that he would receive his Ph.D. if he complied with all of the requests and revisions suggested by the Committee.

104.   In reliance thereon, Mr. Fraser began the incredibly labor-intensive and time-consuming process of revising his written thesis in accordance with the Committee's mandates.

105.   Mr. Fraser worked upwards of seventy hours per week in the spring 2020 term to revise his dissertation in accordance with the guidelines set forth in the documents discussed above, while also complying with the protocols for uploading his drafts and his data to the cloud for review by, and feedback from, his Committee.

106.   Unbeknownst to Mr. Fraser, even as he was laboring to comply with their feedback, members of his Committee, including Dr. Rolls and Dr. Paulson, were petitioning the Dean to expel Mr. Fraser without even giving him the opportunity for a second thesis defense.

107.   On March 21, 2020, it was communicated to Dean Ades that Mr. Fraser's revised draft thesis had been uploaded to the cloud and was ready for review and comments from the Committee.

108.   The Committee initially provided some minor commentary, but the bulk of the feedback and requests for revisions came from Dr. Paulson.

109. Rather than providing the clear feedback mandated by the Program's Degree Requirement Handbook[4] and January 20 letter, the feedback given by Dr. Paulson was unhelpful and often times contradictory.

110. These contradictory instructions included repeated requests that Mr. Fraser re-insert sections he had previously been instructed to delete, or vice versa.

111. Despite the conflicting instructions he had been given, Mr. Fraser worked tirelessly to revise his thesis in accordance with the directions given by Drs. Paulson and Read.

112. On or about May 14, 2020, just a week before Mr. Fraser was scheduled to defend his thesis a second time, Dr. Read indicated that the Committee would not allow it to proceed unless the sections dealing with Malaria were once again moved within the document.

---

[4] The relevant provisions thereof state that dissertation advisors will:

- set clear expectations and goals for students regarding their research and thesis;
- discuss policies and expectations for work hours, vacation time and health contingencies;
- meet regularly and individually with students to provide feedback on research progress and expectations (weekly meetings are recommended);
- provide students with training and oversight in the design of research projects, development of necessary skills, use of rigorous research techniques, and all other aspects of research.

*Id.*

113.   Shortly thereafter, the Committee began making increasingly onerous demands regarding access to Mr. Fraser's supporting data.

114.   In another instance, on or about June 29, 2020, mere weeks before the ultimately rescheduled oral examination, Dr. Paulson sent Mr. Fraser an email demanding that he draft and upload detailed explanations of each of the myriad experiments supporting his thesis.

115.   This demand further required that figures in this thesis document be cross referenced with said data, which required major revisions to the document Mr. Fraser was in the process of finalizing.

116.   Dr. Paulson made these onerous demands despite the requested explanations being contained within the body of the thesis document and being wholly duplicative of separate documents Mr. Fraser already had provided to Dr. Paulson.

117.   Mr. Fraser interpreted these wholly unnecessary requests as being a bad faith stalling tactic on Dr. Paulson's part rather than being motivated by legitimate academic concern or inquiry.

118.   Mr. Fraser's interpretation was later confirmed insofar as, after he had uploaded all of the additional documents requested by Dr. Paulson, no feedback was provided regarding any of the data, and it seems unlikely that the data ever was actually even reviewed by Dr. Paulson or any other member of the Committee.

119.   Upon information and belief, no other graduate student at Penn State had been expected to upload data and analyses in such a detailed fashion or been required to upload all of these things prior to a defense taking place.

120.   Upon information and belief, the Committee's increasingly onerous demands on Mr. Fraser and refusal to provide coherent feedback to him were motivated by personal enmity against Mr. Fraser and not any legitimate academic concern.

121.   On or about June 30, 2020, Dean Ades emailed Mr. Fraser with instructions regarding how to structure his data files for the upcoming oral defense.

122.   Notably, this June 30 email was the only advice and guidance Mr. Fraser was given with respect to the second oral defense by Committee members.

123.   Regarding the data and file instructions, Mr. Fraser worked around the clock over the next week to complete this late-required task.

124.   By July 7, 2020, Mr. Fraser had completed this request and uploaded the data, organized according to Dr. Paulson's request.

125.   In the interim, Mr. Fraser worked with Penn State's Student Disability Resources office to coordinate disability accommodations for his second thesis defense.

126.   The accommodation ultimately approved involved the Committee asking Mr. Fraser questions through an interlocutor, Dean Ades.

127.   Mr. Fraser requested this as an accommodation for his clinical anxiety, which was caused by the repeated, onerous and unfair demands made by his Committee over the preceding eight months.

128.   Shortly thereafter, on or about July 16, 2020, Dean Ades notified Mr. Fraser by email that his second thesis defense would occur less than a week later, on July 22, 2020.

129.   In that same email, Dean Ades provided some general advice regarding preparing for the oral defense, which consisted of a list of general topics he may be questioned on during the defense.

130.   Notably, this was the second and final time Mr. Fraser was provided with any direction or guidance by the Committee regarding his oral defense.

131.   In essence, this meant that Mr. Fraser was going into his oral defense with almost no guidance regarding what was expected of him.

132.   Upon information and belief, the Committee members deliberately declined to provide any guidance to Mr. Fraser regarding his oral defense because they were intentionally setting up Mr. Fraser to fail.

133.   Defendants' failure to provide guidance to Mr. Fraser also was in clear breach of Penn State Graduate School policy GAC 608, which states that the Committee is required to provide the Program's doctoral candidates "clear criteria for evaluation" on final oral examinations.

134.   In the final days before Mr. Fraser's second oral defense of his thesis, Dr. Read also began taking increasingly hostile actions toward Mr. Fraser.

135.   For example, Mr. Fraser requested that Dr. Read write a recommendation that Mr. Fraser could use in applying for positions after he was confirmed as receiving his Ph.D.

136.   It was Mr. Fraser's hope that Dr. Read still would recommend him as a professional courtesy despite the strained relationship between the two of them.

137.   In response, Dr. Read not only declined to write the recommendation but also completely disavowed all of his work and affiliation with Mr. Fraser, refusing to render any further assistance in helping Mr. Fraser get his research published and going so far as instructing Mr. Fraser to exclude Dr. Read's name from all publications detailing the years of research on which they had collaborated.

138.   In effect, Dr. Read's comments indicated that Mr. Fraser's Committee chair was washing his hands of any affiliation with Mr. Fraser and was unlikely to be an impartial party to the proceedings.

139.   Mr. Fraser suspected that Dr. Read's conduct was motivated by personal enmity rather than the quality of Mr. Fraser's dissertation because Dr. Read had: (1) submitted a letter supporting Mr. Fraser for an award for the quality of his dissertation work in 2018; (2) reaffirmed his support for Mr. Fraser receiving said award in an October 31, 2019 email; (3) on several occasions told Mr. Fraser and

other's that the work they were doing was the most important in the Malaria field in over eighty years; and (4) even paid for Mr. Fraser's stipend out of Dr. Read's own pocket when Dr. Paulson apparently was preparing to make good on a threat to withhold said stipend from Mr. Fraser.

140.   Upon information and belief, Dr. Read would not have supported Mr. Fraser's award nomination for the quality of his dissertation work if he did not believe it was Ph.D. worthy.

### A. DESPITE A SEEMINGLY SUCCESSFUL SECOND THESIS DEFENSE, THE COMMITTEE STILL FAILED MR. FRASER AND EJECTED HIM FROM THE PROGRAM.

141.   On the day of his second thesis defense, Mr. Fraser felt fully prepared and was hopeful that he would be treated in good faith by the Committee.

142.   Mr. Fraser's confidence was bolstered further by the fact that he had fully addressed all of the written criticisms provided to him in the aftermath of his first defense.

143.   In the course of his second oral thesis defense, Mr. Fraser answered every question he was asked by the Committee, no follow-up questions were asked of him, and no disagreements with his answers were interposed by the Committee.

144.   In fact, Mr. Fraser perceived that the mood was friendly and jovial during the defense, with no hint that he had not delivered a successful defense.

145.   Mr. Fraser felt he delivered a passing performance at the oral examination, without question.

146.   Mr. Fraser, therefore, was extremely disappointed though not entirely surprised (based on the history described in detail above) to receive word from the Committee that they had failed him a second time.

147.   Adding insult to injury, the Committee further indicated Mr. Fraser would be ejected from the Program without the Ph.D. into which he had invested years of his life, countless hours of incredibly hard work, and enough emotional strain to last a lifetime.

148.   Mr. Fraser knew Defendants failed him and ejected him from the Program not because he deserved to fail or because his scientific achievement in the Program was unworthy of a Ph.D.; he knew Defendants had failed him and ejected him from the Program because of personal animosity and ill will against him.

149.   In the aftermath of Mr. Fraser's second thesis defense, he polled a number of participants in the Program regarding precedents for being failed on grounds of the oral defense alone.

150.   The consensus of this poll revealed that ***no other student in living memory of the Program had been dismissed as a result of a failed oral defense***.

151.   Moreover, if the Committee felt before the second defense that Mr. Fraser was in danger of failing that defense, they had an obligation and duty under

relevant Penn State Graduate School Policies to render guidance to Mr. Fraser and

extend the date of the oral defense if success was not possible.[5]

---

[5] The relevant Penn State policy sections read as follows:

> The primary responsibility of the Ph.D. Committee is to guide the broad scholarly development of the Ph.D. student, including direct responsibility for guidance and assessment of the student's dissertation research and academic progress toward the Ph.D. degree.

*Penn State Graduate School Policy GAC* § 603.1.

> 3. If any committee member finds that the draft submitted to them is not correct and polished with respect to content and style, it is their responsibility to notify the chair at least one week in advance of the final oral examination date. The committee member should indicate their concerns regarding the draft and recommend consideration of postponement of the examination to the chair.
>
> > a. The chair, in consultation with committee members, is responsible for notifying the student and assessing whether the student can make the necessary revisions to the draft before the examination date.
> >
> > b. ***If it is determined that revisions cannot be made in time, the examination must be postponed***.
> >
> > c. If differences of opinion on this matter exist among committee members, and these cannot be resolved within the committee itself, the head of the graduate program must be consulted to hear the expressed concerns and determine whether the examination should be postponed.

*Id*. § 607 (emphasis added).

29

152.   In or about early August 2020, Mr. Fraser received a memo from his Committee providing vague and substantially generic reasoning for failing him at his second defense.

153.   The only specific criticism leveled was that "[t]hroughout the oral defense, [Mr. Fraser] made conclusions that extended far beyond the data presented."

154.   Notably, none of these criticisms were provided to Mr. Fraser prior to his second oral defense, despite his conclusions being expressly stated in his thesis document, nor were any such criticisms raised on the day of the oral defense itself.

**B.    MR. FRASER'S APPEAL OF HIS DISMISSAL FROM THE PROGRAM WAS NEITHER FAIR NOR IMPARTIAL BECAUSE IT WAS OVERSEEN BY THE SAME COMMITTEE MEMBERS WHO HAD FAILED HIM IN THE FIRST INSTANCE.**

155.   Shortly after receiving notice that the Committee had chosen to fail him and expel him from the Program, Mr. Fraser initiated an appeal of the decision with Penn State.

156.   Mr. Fraser followed all administrative requirements imposed by Penn State to the letter and fully exhausted his administrative remedies prior to filing the instant action.

157.   Shortly before the appeal hearing, Mr. Fraser was outraged to learn that the appeal panel would be made up of the very same professors who had failed him in the first instance, including the above-named individual defendants.

158.   Unfortunately, relevant Penn State rules prevented Mr. Fraser from contesting the appeal panel assignments, and he was forced to proceed.

159.   Mr. Fraser met with the Appeal Committee on January 20, 2021.

160.   Mr. Fraser gave a presentation regarding why he had, in fact, earned his Ph.D., according to the standards established by the Program and his Committee.

161.   Mr. Fraser further detailed his history in the Program, the ways he was mistreated during his time in the Program, and the devastating impact the Committee's decision to deny him his Ph.D. had on Mr. Fraser and his family.

162.   Somewhat unsurprisingly, only two members of the Appeal Committee asked Mr. Fraser questions:  Drs. Paulson and Rolls, and those brief questions were overtly biased and not geared toward actually exploring the merits of Mr. Fraser's appeal.

163.   In fact, Drs. Paulson and Rolls' comments were so antagonistic toward Mr. Fraser that the appeal moderator had to remind them repeatedly to keep things civil.

164.   Mr. Fraser eventually was dismissed from the appeal meeting, with the Appeal Committee continuing their deliberation in a secret proceeding without Mr. Fraser's participation.

165.   On or about January 25, 2021, Mr. Fraser received a decision from the Appeal Committee denying his appeal and affirming their prior determination.

166.   In that decision, the Appeal Committee noted several suspect grounds supporting their decision to uphold the denial of his appeal.

167.   Upon information and belief, these reasons constituted *ex post facto* justifications when in reality the decision was motivated by the personal animus held by the Committee members toward Mr. Fraser.

168.   One of the pretexts stated for the denial of the appeal was that Mr. Fraser's "appeal did not address the primary cause for his failure during the oral defense."

169.   In fact, the appeal documents fully addressed this issue and the fact that the Committee held as much suggests that either they did not truly believe this justification or did not even bother to review Mr. Fraser's appeal documents in the first instance.

170.   In another instance, the Committee claimed that Mr. Fraser "was unwilling to take feedback from the committee and incorporate it adequately into his dissertation."

171.   As discussed above, the Committee hardly provided any feedback to Mr. Fraser whatsoever, and Mr. Fraser diligently incorporated what feedback was provided into his final thesis document.

172.   In short, the Appeal Committee's conclusion was simply a regurgitation of the inaccurate and arbitrary reasoning given by the Committee in its decision to fail Mr. Fraser on his second defense.

173.   Shortly after receiving the decision of the Appeal Committee, on or about January 27, 2021, Mr. Fraser appealed the results of his appeal, this time to the office of the Dean of the Penn State Graduate School, Dr. Regina Vasilatos-Younken.

174.   Shortly thereafter, Dean Vasilatos-Younken issued a decision affirming the decision of the Appeal Committee without substantial comment.

175.   With this decision affirming the prior Appeal Committee decision, Mr. Fraser had exhausted his administrative remedies within the Penn State system.

176.   The present action ensues.

## V.   **MR. FRASER WAS NEVER COMPENSATED FOR THE WORK HE PERFORMED THAT WAS NOT A PART OF HIS EDUCATION PROGRAM.**

177.   Mr. Fraser performed research services, at Dr. Paulson's request and with Dr. Paulson's knowledge, for which Ph.D. students were customarily paid by Penn State.

178.   Mr. Fraser's services requested by Dr. Paulson were in support of Dr. Kester and his company, Keystone Nano, a corporate entity established to commercialize intellectual property shared between Dr. Kester, Penn State University and others, and were not part of Mr. Fraser's education Program; though, despite not being an explicit requirement of the Program, Mr. Fraser working for free (effectively as an indentured servant) was an implicit requirement of obtaining his Ph.D. degree.

179.   Nevertheless, Mr. Fraser agreed to perform the research requested by Dr. Paulson with the understanding that Mr. Fraser would be rewarded for his efforts based on longtime practice.

180.   Dr. Paulson controlled the result of Mr. Fraser's work and directed the manner in which the work was accomplished.

181.   Penn State, Dr. Paulson, Dr. Kester, and the private entity, Keystone Nano, availed themselves of and benefitted from Mr. Fraser's services.

182.   Upon information and belief, neither Dr. Paulson nor Dr. Kester nor Keystone Nano ever requested that Penn State pay Mr. Fraser for his services performed for their benefit.

183.   Penn State, via the actions of Dr. Paulson, its employee, and Keystone Nano, via the actions of Dr. Kester, its employee, willfully failed to pay Mr. Fraser, and Mr. Fraser received no pay for the work he performed outside the scope of his Ph.D. program.

184.   At times, Mr. Fraser performed more than 40 hours of such work per week.

185.   Mr. Fraser is entitled to compensation for his work performed.

**COUNT I**
**RETALIATION FOR CONSTITUTIONALLY-PROTECTED**
**FIRST AMENDMENT SPEECH – 42 U.S.C. § 1983**
(Against Defendants Penn State, Dr. Paulson, Dr. Rolls, and Dr. Read)

186.   Mr. Fraser realleges and reincorporates all preceding allegations as though set forth verbatim herein.

187.   The federal and Pennsylvania constitutions grant citizens the right to freely express their views on matters of public concern.

188.   Mr. Fraser had a constitutionally protected interest in his continued employment by Penn State in his capacity as a graduate student and research fellow.

189.   Mr. Fraser engaged in acts of protected speech and petitioning activity when he commented on a matter of public concern, specifically by bringing the perceived abuse of Penn State resources and federal funds by Dr. Paulson to the attention of relevant parties within the Penn State administrative structure.

35

190. Dr. Paulson, both individually and in concert with the other Defendants, took adverse action against Mr. Fraser for his acts of protected speech sufficient to chill a person of ordinary firmness from continuing in that activity, including, but not limited to, losses of privileges and culminating in his termination from his position in the Program.

191. Dr. Paulson's actions, both individually and in concert with the other Defendants, were improperly motivated at least in part by Mr. Fraser's exercise of his rights to freedom of speech.

192. Dr. Paulson's actions, both individually and in concert with the other Defendants, exhibited a reckless or callous disregard of and/or indifference to Mr. Fraser's protected constitutional rights.

193. Mr. Fraser has been harmed by Defendants' actions, and he seeks damages in an amount to be determined at trial.

**COUNT II**
**DENIAL OF CONSTITUTIONALLY-PROTECTED**
**SUBSTANTIVE DUE PROCESS RIGHT – 42 U.S.C. § 1983**
(Against Defendants Penn State, Dr. Paulson, Dr. Rolls, and Dr. Read)

194. Mr. Fraser realleges and reincorporates all preceding allegations as though set forth verbatim herein.

195. The federal and Pennsylvania constitutions protect against deprivations of life, liberty, or property without due process of law.

196.   Mr. Fraser has a constitutionally-protected interest in his pursuit of an education.

197.   Mr. Fraser has a constitutionally-protected property interest in his continued enrollment in the Program and the anticipated conferral of his Ph.D.

198.   As a graduate student, Mr. Fraser was entitled to due process before he was dismissed from the Program.

199.   Mr. Fraser ostensibly was discharged on the grounds that the Committee felt that a third oral defense would not be successful and therefore was unwarranted.

200.   Upon information and belief, the decision to discharge Mr. Fraser was actually based upon bad faith or ill will unrelated to academic performance and was therefore arbitrary and capricious.

201.   Mr. Fraser was entitled to both notice and a hearing before his dismissal from the Program.

202.   Mr. Fraser was not put on notice or given an opportunity to be heard on the topic of whether a third defense would be successful before his dismissal from the Program.

203.   University policies authorized Mr. Fraser's dissertation Committee members, in their capacities as University faculty, to judge all aspects of Mr. Fraser's performance in the Program.

204.   The Individual Defendants, acting under the authority given them by the University, dismissed Mr. Fraser from the Program without providing him any notice or a hearing.

205.   Defendants' dismissal of Mr. Fraser from the Program constituted state action.

206.   Defendants' dismissal of Mr. Fraser from the Program without providing a pre-dismissal notice and a hearing deprived him of a constitutionally-protected interest without due process, in violation of the federal and Pennsylvania constitutions.

207.   Defendants' deprivation of Mr. Fraser's constitutionally-protected interest without due process damaged Mr. Fraser by halting his pursuit of a Ph.D., rendering him unemployable or underemployable in his chosen field, and harming him financially in an amount to be determined at trial.

## COUNT III
## DENIAL OF CONSTITUTIONALLY-PROTECTED
## PROCEDURAL DUE PROCESS RIGHT – 42 U.S.C. § 1983
(Against Defendants Penn State, Dr. Paulson, Dr. Rolls, and Dr. Read)

208.   Mr. Fraser realleges and reincorporates all preceding allegations as though set forth verbatim herein.

209.   The federal and Pennsylvania constitutions protect against deprivations of life, liberty, or property without due process of law.

210.   Mr. Fraser has a constitutionally-protected interest in his pursuit of an education.

211.   Mr. Fraser has a constitutionally-protected property interest in his continued enrollment in the Program.

212.   As a graduate student, Mr. Fraser was entitled to due process before he was dismissed from the Program.

213.   Upon information and belief, the decision to dismiss Mr. Fraser was based in substantial part upon unsubstantiated accusations by Dr. Paulson that Mr. Fraser had fabricated data.

214.   Mr. Fraser was entitled to a presumption of innocence with regard to the unfounded claims of data fabrication absent both notice and an impartial hearing to determine the veracity of such claims.

215.   Mr. Fraser was not put on notice or given an opportunity to be heard on the topic of the alleged data fabrication matter.

216.   University policies authorized Mr. Fraser's dissertation Committee members, in their capacities as University faculty, to judge all aspects of Mr. Fraser's performance in the Program.

217.   The Individual Defendants, acting under the authority given them by the University, accounted for the alleged data fabrication in their decision to dismiss Mr. Fraser from the Program without providing him any notice or a hearing on the matter.

218.   Defendants' dismissal of Mr. Fraser from the Program constituted state action.   Defendants' consideration of the unfounded data fabrication claims in determining whether to dismiss Mr. Fraser from the Program without providing any pre-dismissal notice and an impartial hearing deprived him of a constitutionally-protected interest without due process, in violation of the federal and Pennsylvania constitutions.

219.   Defendants' deprivation of Mr. Fraser's constitutionally-protected interest without due process damaged Mr. Fraser by halting his pursuit of a Ph.D., rendering him unemployable or underemployable in his chosen field, and harming him financially in an amount to be determined at trial.

## COUNT IV
## DENIAL OF CONSTITUTIONALLY-PROTECTED
## PROCEDURAL DUE PROCESS RIGHT – 42 U.S.C. § 1983
(Against Defendants Penn State, Dr. Paulson, Dr. Rolls, and Dr. Read)

220.   Mr. Fraser realleges and reincorporates all preceding allegations as though set forth verbatim herein.

221.   The federal and Pennsylvania constitutions protect against deprivations of life, liberty, or property without due process of law.

40

222.   Mr. Fraser has a constitutionally-protected interest in his pursuit of an education.

223.   Mr. Fraser has a constitutionally-protected property interest in his continued enrollment in the Program.

224.   As a graduate student, Mr. Fraser was entitled to due process in the course of his appeals of the Committee's decision to deny him his Ph.D. and eject him from the Program.

225.   The appeal in question constituted an adjudicative proceeding conducted by a state actor.

226.   Mr. Fraser was entitled to a hearing before a fair and impartial tribunal, free of bias for or against the parties in question.

227.   Mr. Fraser's appeal raised questions of the bias and bad faith conduct of the members of his dissertation Committee and addressed this issue in the course of the hearing.

228.   The tribunal convened by the University to hear Mr. Fraser's appeal was made up of the very same faculty members who were the subject of Mr. Fraser's complaints on appeal in the first instance.

229.   Because the members of the appeal tribunal had a vested interest in upholding the decision of the dissertation Committee and protecting their professional reputations, the appeal tribunal necessarily were not free of bias for or against a particular party.

230.   The Individual Defendants, acting under the authority given them by the University, declined to recuse themselves from sitting in judgment on Mr. Fraser's appeal and issued a decision to uphold the determination of the dissertation Committee.

231.   Defendants' denial of Mr. Fraser's appeal constituted state action.

232.   Defendants' failure to recuse themselves from sitting in judgment on an appeal in which they necessarily knew there was a high probability of actual bias deprived Mr. Fraser of a constitutionally-protected interest without due process, in violation of the federal and Pennsylvania constitutions.

233.   Defendants' deprivation of Mr. Fraser's constitutionally-protected interest without due process damaged Mr. Fraser by halting his pursuit of a Ph.D., rendering him unemployable or underemployable in his chosen field, and harming him financially in an amount to be determined at trial.

## COUNT V
## BREACH OF CONTRACT

(Against Defendants Penn State, Dr. Paulson, Dr. Rolls, and Dr. Read)

234.   Mr. Fraser realleges and reincorporates all preceding allegations as though set forth verbatim herein.

235.   The University and Program policies and guidance letters provided to Mr. Fraser and referenced herein above created contractual duties on the part of the University, Program, and their representatives.

236.   As a matriculated student at the University, Mr. Fraser was a contractual beneficiary of the University's policies.

237.   As a matriculated student in the Program, Mr. Fraser was a contractual beneficiary of the Program's policies.

238.   The University, through the named Individual Defendants, breached its obligations under the University and/or Program policies and guidance letters referenced above by: (1) failing to provide Mr. Fraser with any meaningful guidance in advance of either of his oral defenses; and (2) declining to award Mr. Fraser his Ph.D. even after he had fulfilled all of the required terms.

239.   Mr. Fraser fulfilled his obligations under all applicable University-specific policies.

240.   Mr. Fraser fulfilled his obligations under all Program-specific policies.

241.   Mr. Fraser fulfilled his obligations under all guidance letters provided to him in the aftermath of his first thesis defense.

242.   The University's breaches of its obligations under the applicable policies caused Mr. Fraser to suffer damages in an amount to be determined at trial.

### COUNT VI
### BREACH OF IMPLIED COVENANT OF
### GOOD FAITH AND FAIR DEALING
(Against Defendants Penn State, Dr. Paulson, Dr. Rolls, and Dr. Read)

243.   Mr. Fraser realleges and incorporates by reference all paragraphs above as if specifically set forth herein.

244.   The agreements between the parties delineating the terms under which Mr. Fraser would receive his Ph.D., including relevant University and Program policies and guidance letters supplied to Mr. Fraser in the aftermath of his first thesis defense, contained an implied covenant of good faith and fair dealing.

245.   Each unnecessary and burdensome requirement imposed upon Mr. Fraser regarding his research data was done in bad faith and to deprive him of the Ph.D. he had rightfully earned.

246.   Upon information and belief, the withdrawal of stipend support and health insurance in the aftermath of his first thesis defense, despite knowing that Mr. Fraser is a severe hemophiliac, was done in bad faith and to deprive him of the Ph.D. he had rightfully earned.

247.   Upon information and belief, Dr. Paulson's accusations of data fabrication were done in bad faith and to deprive Mr. Fraser of the Ph.D. he had rightfully earned.

248.   Defendants chose to terminate Mr. Fraser's participation in the Program in bad faith, in a decision based upon personal enmity and malice rather than upon acceptable academic concerns.

249.   Mr. Fraser has been harmed by Defendants' actions and seeks damages in an amount to be determined at trial.

**COUNT VII**
**PROMISSORY ESTOPPEL/DETRIMENTAL RELIANCE**
(Against Defendants Penn State, Dr. Paulson, Dr. Rolls, and Dr. Read)

250.   Mr. Fraser realleges and incorporates by reference all paragraphs above as if set forth verbatim herein.

251.   Dr. Read promised Mr. Fraser that, despite the fact Drs. Paulson and Rolls were "gunning to fail" Mr. Fraser, he would receive his Ph.D. if he kept quiet and went with the flow at his first oral thesis defense.

252.   Dr. Read promised Mr. Fraser that he would receive his Ph.D. if he addressed all of the critiques raised by the Committee in the aftermath of his first thesis defense, writing:  "I can assure you that if you address all the issues listed in my letter of Jan 9, you will get the degree."

253.   Defendants reasonably should have expected that their promises would induce Mr. Fraser to act in reliance thereon.

254.   Mr. Fraser reasonably relied upon Defendants' promises to his detriment.

255.   As a result, Mr. Fraser was damaged, and injustice can be avoided only by enforcing Defendants' promises.

256.   Mr. Fraser has been harmed thereby and seeks damages in an amount to be determined at trial.

## COUNT VIII
## DEFAMATION *PER SE* AND DEFAMATION
(Against Defendants Penn State and Dr. Paulson)

257.   Mr. Fraser realleges and reincorporates all preceding allegations as though set forth verbatim herein.

258.   Upon information and belief, since in or about December 2019, Dr. Paulson has published statements, both oral and written, about Mr. Fraser to each member of his dissertation Committee, including Drs. Rolls and Read.

259.   On information and belief, to these individuals, Dr. Paulson has stated that Mr. Fraser was dishonest, had failed to credit Dr. Paulson on a conference presentation where such credit was expected, and falsified his dissertation data and/or findings.

260.   Dr. Paulson's statements that Mr. Fraser was dishonest were false.

46

261.   Dr. Paulson's statements that Mr. Fraser had failed to appropriately credit him on a conference presentation were false.

262.   Dr. Paulson's statements that Mr. Fraser falsified his dissertation data were false.

263.   Dr. Paulson's statements that Mr. Fraser falsified his dissertation findings were false.

264.   Dr. Paulson's false statements about Mr. Fraser falsifying his dissertation data and dissertation findings were defamatory *per se* in that they charged him with conduct incompatible with the exercise of a lawful business, trade, profession, office, or practice.

265.   Dr. Paulson made one or more defamatory statements against Mr. Fraser out of ill will, evidencing his malice toward Mr. Fraser.

266.   Dr. Paulson made one or more defamatory statements against Mr. Fraser without reasonably believing such statements, evidencing his malice toward Mr. Fraser.

267.   Dr. Paulson published his defamatory statements against Mr. Fraser excessively, evidencing his malice toward Mr. Fraser.

268.   Dr. Paulson's publication of these false statements damaged Mr. Fraser, including his reputation, in an amount to be determined at trial.

## COUNT IX
## BREACH OF FIDUCIARY DUTIES
(Against Defendants Penn State and Dr. Paulson)

269.   Mr. Fraser realleges and reincorporates all preceding allegations as though set forth verbatim herein.

270.   As Mr. Fraser's dissertation advisor, Dr. Paulson was in a position to have and exercise influence over Mr. Fraser.

271.   Dr. Paulson's status as Mr. Fraser's dissertation mentor placed Dr. Paulson in a position of superiority over Mr. Fraser.

272.   Dr. Paulson's status as Mr. Fraser's dissertation mentor caused Mr. Fraser to place peculiar confidence in Dr. Paulson respecting Mr. Fraser's dissertation.

273.   As Mr. Fraser's dissertation mentor, Dr. Paulson, in fact, had and exercised influence over Mr. Fraser.

274.   Dr. Paulson's dissertation mentor-mentee relationship with Mr. Fraser was a fiduciary relationship under Pennsylvania law.

275.   Based on his dissertation mentor-mentee relationship with Mr. Fraser, Dr. Paulson had a duty under Pennsylvania law to act primarily for Mr. Fraser's benefit respecting their dissertation mentor-mentee relationship, rather than for his own benefit.

///

276.   Dr. Paulson breached his fiduciary duty to Mr. Fraser when he:

    a.   Required Mr. Fraser to engage in additional uncompensated work in Dr. Paulson's lab without compensation or academic credit that fairly should have been expected;

    b.   Personally benefited from Mr. Fraser's uncompensated labor;

    c.   Threatened to withhold stipend support unless Mr. Fraser continued to provide additional, uncompensated labor;

    d.   Revoked Mr. Fraser's lab access so that he could not access vital equipment or engage in necessary experimentation to support his dissertation;

    e.   Withdrew stipend support and health insurance coverage after Mr. Fraser's first thesis defense despite being on notice that Mr. Fraser was a severe Hemophiliac;

    f.   Engaged in the bad faith stalling tactic of imposing greater data disclosure than was expected of other similarly-situated graduate students; and

    g.   Accused Mr. Fraser of fabricating his dissertation data.

277.   Dr. Paulson's breach of his fiduciary duty to Mr. Fraser caused him to suffer damages in an amount to be determined at trial.

## COUNT X
## VIOLATION OF PENNSYLVANIA MINIMUM WAGE ACT, ACT OF JUNE 23, 1978, P.L. 537, No. 93, §§ 201-207 (43 P.S. §§ 1301.201-1301.207)

(Against Defendants Penn State, Dr. Paulson, Keystone Nano, and Dr. Kester)

278.   Mr. Fraser realleges and reincorporates all preceding allegations as though set forth verbatim herein.

279.   Mr. Fraser performed research services, at Dr. Paulson's request and with Dr. Paulson's knowledge, for which Ph.D. students were customarily paid by Penn State.

280.   Mr. Fraser's services requested by Dr. Paulson in support of Dr. Kester and his company, Keystone Nano, a corporate entity established to commercialize intellectual property shared between Dr. Kester, Penn State University and others, were not part of Mr. Fraser's education Program; though, despite not being an explicit requirement of the Program, Mr. Fraser working for free (effectively as an indentured servant) was an implicit requirement of obtaining his Ph.D.

281.   Nevertheless, Mr. Fraser agreed to perform the research requested with the understanding that he would be rewarded for his efforts based on longtime practice.

282.   Dr. Paulson controlled the result of Mr. Fraser's work and directed the manner in which the work was accomplished.

283.   Penn State, Dr. Paulson, Dr. Kester, and the private entity, Keystone Nano, availed themselves of and benefitted from Mr. Fraser's services.

284.   Upon information and belief, Dr. Paulson and Dr. Kester never requested that Penn State or Keystone Nano pay Mr. Fraser.

285.   Penn State, via the actions of Dr. Paulson, its employee, and Keystone Nano, via the actions of Dr. Kester, its employee, willfully failed to pay Mr. Fraser, and Mr. Fraser received no pay for the work he performed outside the scope of his Ph.D. Program.

286.   At times, Mr. Fraser performed more than 40 hours of work per week.

287.   Mr. Fraser is entitled to compensation for work performed in an amount to be determined at trial plus costs and attorney's fees pursuant to the Pennsylvania Minimum Age Act.

## COUNT XI
## VIOLATION OF PENNSYLVANIA WAGE PAYMENT AND COLLECTION LAW, ACT OF JULY 14, 1961, P.L. 637, No 329, *as amended*, July 14, 1977, P.L. 82, No. 30 (43 P.S. §§ 260.1 *et seq.*)
(Against Defendants Penn State, Dr. Paulson, Keystone Nano, and Dr. Kester)

288.   Mr. Fraser realleges and reincorporates all preceding allegations as though set forth verbatim herein.

289.   The Wage Payment and Collection Law provides in relevant part: "Every employer shall pay all wages, ..., due to his employees on regular paydays

designated in advance by the employer.  Overtime wages may be considered as wages earned and payable in the next succeeding pay period."  43 P.S. § 260.3.

290.   By its actions alleged above, Penn State and Keystone Nano violated the provisions of the Wage Payment and Collection Law, 43 P.S. §§ 260.1 *et seq.*

291.   As a result of Penn State's and Keystone Nano's unlawful acts, Mr. Fraser has been deprived of compensation in amounts to be determined at trial, and he is entitled to recovery of such amounts, and liquidated damages, together with costs and attorneys' fees pursuant to the Wage Payment and Collection Law, 43 P.S. §§ 260.9a, 260.10.

**COUNT XII**
**BREACH OF IMPLIED CONTRACT / UNJUST ENRICHMENT**
(Against Defendants Penn State, Dr. Paulson, Keystone Nano, and Dr. Kester)

292.   Mr. Fraser realleges and reincorporates all preceding allegations as though set forth verbatim herein.

293.   Mr. Fraser and Dr. Paulson agreed that Mr. Fraser would perform services requested by Dr. Paulson on behalf of Dr. Kester and Keystone Nano under circumstances indicating that Mr. Fraser would be compensated for this work.

294.   Expectation of compensation was a result of longtime practice of the Department and Penn State wherein graduate students and post-doctoral students, including Emily Finch and Diwakar Basthili, respectively, were compensated above and beyond their academic stipends for work performed on behalf of Dr. Paulson,

Dr. K. Sandeep Prabhu, and the various corporate entities that were structured to commercialize intellectual property shared between Dr. Paulson, Dr. Prabhu, and Penn State University.

295.   Mr. Fraser justifiably relied upon this past practice in accepting the work requested by Dr. Paulson above and beyond what was expected of him as a pre-doctoral student in the Program.

296.   Penn State and Keystone Nano violated the covenants of good faith and fair dealing by their failure to pay Mr. Fraser.

297.   Under the circumstances, it would be inequitable for Penn State and Keystone Nano to continue to retain Mr. Fraser's wages.

298.   Penn State and Keystone Nano were unjustly enriched in the amount of the value of Mr. Fraser's services.

299.   Mr. Fraser was damaged in an amount to be determined at trial.

## COUNT XIII
## VIOLATION FOR FAILURE TO MAINTAIN EMPLOYMENT AND PAYMENT RECORDS, ACT OF NOV. 26, 1978, P.L. 1212, No. 286, *as amended*, Nov. 29, 1990, P.L. 596, No. 149
## (43 P.S. §§ 1321-1324)

(Against Defendants Penn State, Dr. Paulson, Keystone Nano, and Dr. Kester)

300.   Mr. Fraser realleges and reincorporates all preceding allegations as though set forth verbatim herein.

301.   For purposes of work Mr. Fraser performed outside the scope of his Ph.D. Program, Penn State and Keystone Nano were Plaintiff's employers.  See 43 P.S. § 1321.

302.   Pennsylvania law requires Penn State and Keystone Nano to keep clear, accurate and complete employment and payroll records in Mr. Fraser's personnel file as defined at 43 P.S. § 1321.

303.   Accordingly, 43 P.S. § 1322 requires Penn State and Keystone Nano to keep clear, accurate and complete employment and payroll records in Mr. Fraser's personnel file.

304.   Penn State and Keystone Nano have failed to keep true and accurate time records for all hours worked by Mr. Fraser.

## COUNT XIV
## FAILURE TO PAY MINIMUM WAGE IN VIOLATION OF THE FAIR LABOR STANDARDS ACT OF 1938, 29 U.S.C. §§ 201, *et seq.*
(Against Defendants Penn State, Dr. Paulson, Keystone Nano, and Dr. Kester)

305.   Mr. Fraser realleges and reincorporates all preceding allegations as though set forth verbatim herein.

306.   Penn State and Keystone Nano failed to pay Mr. Fraser for all hours worked by Mr. Fraser outside the scope of his Ph.D. program.

307.   Mr. Fraser suffered damages in an amount to be determined at trial.

## COUNT XV
## FAILURE TO PAY OVERTIME IN VIOLATION OF THE FAIR LABOR STANDARDS ACT OF 1938, 29 U.S.C. §§ 201, *et seq.*
(Against Defendants Penn State, Dr. Paulson, Keystone Nano, and Dr. Kester)

308.   Mr. Fraser realleges and reincorporates all preceding allegations as though set forth verbatim herein.

309.   At times, Mr. Fraser worked more than 40 hours per week on the non-degree-related work requested of him by Dr. Paulson.

310.   As a result of the failure to pay Mr. Fraser at a rate of one and one half times the hourly wage he was owed, Penn State and Keystone Nano have violated the overtime requirement provision of the Fair Labor Standards Act.

311.   Mr. Fraser has suffered damages in an amount to be determined at trial.

## COUNT XVI
## FAILURE TO MAINTAIN TIME RECORDS IN VIOLATION OF THE FAIR LABOR STANDARDS ACT OF 1938, 29 U.S.C. §§ 201, *et seq.*
(Against Defendants Penn State, Dr. Paulson, Keystone Nano, and Dr. Kester)

312.   Mr. Fraser realleges and reincorporates all preceding allegations as though set forth verbatim herein.

313.   The Fair Labor Standards Act requires Penn State and Keystone Nano to maintain true and accurate time records for all hours worked by Mr. Fraser outside the scope of his Ph.D. Program.

///

## VI.  **JURY CLAIM**

The Plaintiff claims a trial by jury for all issues so triable.

## VII.  **PRAYER FOR RELIEF**

WHEREFORE, Mr. Fraser prays for relief as follows:

1.  That a monetary judgment be entered in favor of Mr. Fraser and against the University in an amount to be determined at trial;

2.  That a monetary judgment be entered in favor of Mr. Fraser and against Dr. Paulson in an amount to be determined at trial;

3.  That a monetary judgment be entered in favor of Mr. Fraser and against Dr. Rolls in an amount to be determined at trial;

4.  That a monetary judgment be entered in favor of Mr. Fraser and against Dr. Read in an amount to be determined at trial;

5.  That a monetary judgment be entered in favor of Mr. Fraser and against Keystone Nano in an amount to be determined at trial;

6.  That a monetary judgment be entered in favor of Mr. Fraser and against Dr. Kester in an amount to be determined at trial;

7.  That the Court declare the letters delineating necessary revisions Mr. Fraser received in the aftermath of his first oral thesis defense are binding on the University, that Mr. Fraser could rely upon the

representations therein, that Mr. Fraser complied with his obligations under the letters, that the University discharged him from the Program in violation of the plan set forth in the letters, and that Mr. Fraser is entitled to a remedy for the University's breach, including, but not limited to, specific performance, which would require that he be reinstated into the Program and awarded his Ph.D.

8. That the University be enjoined from continuing its enforcement of its discharge of Mr. Fraser from the Program, ordered to reinstate him into the Program, and ordered to grant him his Ph.D. in accordance with the terms of the letters received by Mr. Fraser in the aftermath of his first oral thesis defense.

9. For the full amount of unpaid wages, in an amount to be determined at trial.

10. For the liquidated damages in an amount equal to the pay Mr. Fraser should have received pursuant to the Pennsylvania Minimum Wage Law and the Fair Labor Standards Act

11. For the pre-judgment interest at the highest level rate, from and after the date of service of the initial complaint in this action, on all unpaid wages from the date such wages were earned and due.

12.   For injunctive and declaratory relief described herein, as the Court deems appropriate.

13.   For recovery of Mr. Fraser's attorneys' fees and costs incurred in pursuit of this action.

14.   For punitive damages.

15.   For such and other relief as this Court deems appropriate.

Dated this 17th day of May, 2022.

Respectfully Submitted,

 /s/Michael A. Farnan
MICHAEL A. FARNAN
Pennsylvania Bar No.  69158
**FARNAN LAW OFFICE**
P.O. Box 42397
Pittsburgh, PA 15203
Telephone: (412) 592-7737
Facsimile: (412) 202-1313
Email: mfarnan@farnanlawoffice.com

JASON J. BACH
(*Pro Hac Vice Admission Pending*)
Nevada Bar No. 7984
**THE BACH LAW FIRM, LLC**
7881 W. Charleston Blvd., Suite 165
Las Vegas, Nevada 89117
Telephone: (702) 925-8787
Facsimile: (702) 925-8788
Email:  jbach@bachlawfirm.com
*Attorneys for Plaintiff*