## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JAMES FRASER, | No. 4:22-CV-00726 |
| Plaintiff, | (Chief Judge Brann) |
| v. | |
| THE PENNSYLVANIA STATE UNIVERSITY, a Pennsylvania education institution; DR. ROBERT PAULSON, an individual, in his official and individual capacities; DR. MELISSA ROLLS, an individual, in her official and individual capacities; DR. ANDREW READ, an individual, in his official and individual capacities; and KEYSTONE NANO, INC. a Pennsylvania business corporation, | |
| Defendants. | |

## MEMORANDUM OPINION

### FEBRUARY 7, 2023

The relationship between a graduate student and his thesis advisor is an important one, and former Pennsylvania State University (the "University") doctoral candidate James Fraser alleges that his relationship with his advisor—Dr. Robert Paulson—was acrimonious and rife with challenges. Fraser's allegations begin in 2017, when he filed a formal complaint asserting that Paulson had forced Fraser to complete work outside the scope of his thesis. The University investigated Fraser's complaint and declined to take any action. However, Fraser's complaint against

Paulson further deteriorated of the pair's relationship. Fraser attempted to defend his thesis twice in 2020, but his doctoral thesis committee (which included Paulson, Dr. Melissa Rolls, and Dr. Andrew Read) (the "Committee") deemed his thesis insufficient both times. After Fraser's second failed attempt, the Committee dismissed him from the graduate program.

As a reaction to that dismissal, Fraser has brought suit against the University, Paulson, Rolls, Read, and Keystone Nano, Inc. (an incorporated entity alleged to be affiliated with Paulson). The gravamen of Fraser's suit is a number of alleged constitutional violations, each of which fail to satisfy the federal court pleading standard. First, Fraser alleges that the Defendants violated his First Amendment rights by retaliating against him for his 2017 complaint against Paulson. That complaint, however, does not involve a matter of "public concern" protected by the First Amendment. Fraser next alleges that Defendants violated his rights to substantive and procedural due process—but the allegations do not defeat the wide discretion this Court is required to give state universities' in making their own "academic decisions." Along similar lines, the facts alleged indicate that the University's appeal process gave Fraser the appropriate "informal give-and-take" required for procedural due process in public universities.

Finally, Fraser brings a Fair Labor Standards Act ("FLSA") against Keystone Nano, the University, and Paulson, alleging that he is owed wages for work performed in Paulson's lab. But the Complaint fails to allege facts satisfying the

elements required for a cause of action under the FLSA, namely that he had an employer-employee relationship (as defined by the Act) with any of those Defendants. Fraser also brings a number of other state law claims, over which the Court declines to exercise its supplemental jurisdiction in light of the failure of the constitutional and federal claims to satisfy the standard of Federal Rule of Civil Procedure 12(b)(6).

## I.    BACKGROUND

### A.    Factual Background[1]

At all times relevant to this matter, Fraser was a doctoral candidate in the University's Molecular, Cellular, and Integrative Biosciences Graduate Program (the "Program").[2] Fraser matriculated at the University and began his doctoral studies in the Program in the autumn of 2014.[3] Paulson, Rolls, and Read are professors at the University and were all members of the Committee.[4] Paulson was Fraser's thesis advisor, and Fraser began working in Paulson's lab in the summer of 2015.[5]

Paulson tasked Fraser with additional responsibilities beyond the scope of his fellowship and thesis duties, including "providing philosophical and material experimental support for other students in the lab in excess of several hundred hours,

---

[1]   Facts set forth in this section are stated as they have been alleged in the Complaint (Doc. 1).
[2]   Doc. 1 ¶ 5.
[3]   *Id.* ¶ 13.
[4]   *Id.* ¶¶ 7-9, 30.
[5]   *Id.* ¶¶ 21-22.

as well as over a thousand hours of leukemia research work" that furthered Paulson's private business enterprise, Keystone Nano, a "corporate entity established to commercialize intellectual property."[6] Fraser was not paid for this additional work or given additional academic credit.[7]

Fraser believed that Paulson's conduct violated his agreement with the University via the Program's "Degree Requirement Handbook," which mandated that thesis advisors refrain from "assigning duties or activities that are outside students' academic responsibilities or are detrimental to the timely completion of their degrees."[8] In 2017, Fraser raised his concerns to Rolls and Read, who indicated that they were unwilling or unable to take action due to the fear of "political reprisal" by Paulson, who was "extremely influential within the Department."[9] Fraser then filed an official complaint with the University, who investigated the complaint and declined to make any findings or take action against Paulson.[10]

In 2019, Paulson informed Fraser that he intended to withhold Fraser's stipend support unless he followed Paulson's "every direction regardless of whether [Fraser] believed it presented a conflict of interest with [the University] or a violation of [Fraser's] contract with the University."[11] Paulson also spread untrue accusations

---

[6]   *Id.* ¶¶ 23-24, 178.
[7]   *Id.* ¶ 25.
[8]   *Id.* ¶ 26.
[9]   *Id.* ¶¶ 28-31.
[10]   *Id.* ¶¶ 34-35.
[11]   *Id.* ¶ 38.

within the Department that Fraser had failed to credit Paulson on a conference presentation, and locked Fraser out of the lab on several occasions, which deprived Fraser access to Department resources and caused him to lose time he could have devoted to his experiments and doctoral research.[12]

Other members of the Department, including Rolls, Read, and Fraser's fellow students, began to take actions "adverse to [Fraser's] interests."[13] Around the autumn 2016 semester, another student filed a Title IX complaint against Fraser, but Fraser was cleared of any wrongdoing.[14] Despite this clearance, Fraser was still barred from being in the lab at the same time as the accusing student and was forced to alter his own research work and schedule to accommodate the complainant.[15] Fraser alleges that these actions were "condoned and orchestrated by Paulson in retaliation for [Fraser's] previous complaints."[16] All the while, Paulson continued to request that Fraser devote significant time to other students' projects and leukemia research, both of which were unrelated to Fraser's thesis work.[17] These requests were in violation of the graduate school handbooks, the University's rules pertaining to graduate school fellows, and the bylaws governing Fraser's research practices.[18] No other

---

[12]  *Id.* ¶¶ 41-43.
[13]  *Id.* ¶¶ 44, 46.
[14]  *Id.* ¶¶ 47-48.
[15]  *Id.* ¶ 49.
[16]  *Id.* ¶ 51.
[17]  *Id.* ¶ 54.
[18]  *Id.* ¶ 55.

student in Fraser's lab was similarly tasked with providing uncompensated labor in this manner during their thesis-drafting period.[19]

Fraser attempted to defend his thesis on two occasions. The first attempt was scheduled to take place in December 2019, and in preparation, Fraser met with members of the Committee over the summer and fall semesters of 2019.[20] During these meetings, the Committee members explained what Fraser needed to do for a successful defense of the thesis.[21] They also instructed Fraser to complete additional experiments, which he did.[22] In an e-mail dated November 1, 2019, Rolls informed Fraser that "as long as he passed his oral defense at the end of the fall 2019 semester, he would be allowed to turn in his completed thesis in the spring 2020 without issue."[23]

A week before the date of Fraser's thesis defense, Paulson and Rolls raised a number of concerns regarding the "polish" of Fraser's thesis document, which confused Fraser because he knew several colleagues who had been awarded their degrees despite having submitted dissertations far less "polished" than his own.[24] After Fraser implemented all of Rolls' and Paulson's revisions, his thesis defense was cancelled two days before it was scheduled to take place.[25] Fraser was instructed

---

[19]   *Id.* ¶ 57.
[20]   *Id.* ¶ 68.
[21]   *Id.*
[22]   *Id.*
[23]   Doc. 1 ¶ 72.
[24]   Doc. 1 ¶¶ 73-75.
[25]   *Id.* ¶¶ 76-77.

to write a new version of his thesis document over the winter break and to defend it the first week of January 2020.[26] Before the defense, Read e-mailed Fraser, stating that Paulson and Rolls were "gunning to fail [Fraser]," but assuring him that if he "kept quiet and went with the flow," he would get his degree.[27]

On the date of Fraser's first thesis defense attempt, his presentation portion was well-received, but the Committee question-and-answer portion was hostile in nature.[28] Paulson and Rolls questioned Fraser about topics "largely irrelevant to the topic of Mr. Fraser's thesis," and commented on a number of perceived deficiencies in the written thesis document.[29] Following his defense, the Committee failed Fraser—allegedly because Paulson had told the other Committee members that Fraser had fabricated some of his data.[30] The University then discontinued Fraser's stipend payments and his health insurance.[31] This was particularly injurious to Fraser because he suffers from hemophilia, a blood disorder requiring frequent treatment and hospitalization.[32] The Committee sent Fraser multiple letters describing why he had failed his defense.[33] Read also sent Fraser an e-mail stating: "I can assure you that if you address all the issues listed in my letter . . . you will get the degree."[34]

---

[26] *Id.* ¶ 78.
[27] *Id.* ¶ 82.
[28] *Id.* ¶¶ 84.
[29] *Id.* ¶¶ 85-86.
[30] *Id.* ¶ 88.
[31] *Id.* ¶ 91.
[32] *Id.* ¶ 90.
[33] *Id.* ¶¶ 93-95; 97-102.
[34] *Id.* ¶ 96.

Fraser uploaded a revised draft thesis to the University system in or around March 2020, and the Committee provided feedback and requests for revisions, the bulk of which came from Paulson.[35] The Complaint alleges that these requests for revisions were a "bad faith stalling tactic on Paulson's part" because while Fraser was working to implement the requested revisions, Rolls and Paulson were petitioning for Fraser's expulsion.[36]

By July 7, 2020, Fraser uploaded all requested data associated with his thesis, and his defense was scheduled to take place on July 22.[37] Prior to his defense, he received an e-mail from the Program's Dean, Sarah Ades, which included general advice regarding oral defense preparation and a list of "general topics [Fraser] may be questioned on during the defense."[38] The Complaint alleges that Fraser's Committee members failed to provide Fraser with any additional guidance regarding what was expected of him because they were deliberately setting him up to fail.[39]

After what appeared to have been a successful defense presentation, the Committee nevertheless informed Fraser that they had failed him for a second time, and that—this time—he would also be ejected (or expelled) from the Program.[40] The rationale for the failure was that "[t]hroughout the oral defense, [Fraser] made

---

[35] *Id.* ¶¶ 107-108.
[36] *Id.* ¶¶ 106, 117.
[37] *Id.* ¶ 124, 128.
[38] *Id.* ¶ 129.
[39] *Id.* ¶¶ 132-33.
[40] *Id.* ¶¶ 143-47.

conclusions that extended far beyond the data presented."[41] Fraser polled a number of Program participants and learned that "no other student in living memory of the Program had been dismissed as a result of a failed oral defense."[42]

Fraser appealed the Committee's decision to fail and expel him, and he learned that the appeal tribunal panel would include Paulson, Rolls, and Read.[43] During Fraser's appeal presentation, Paulson and Rolls questioned Fraser, and the proceeding's moderator had to remind them to "keep it civil."[44] On January 25, 2021, Fraser received the appeal committee's decision, which denied Fraser's appeal and affirmed the Committee's decision to fail and dismiss him.[45] The appeal committee stated a number of reasons for their decision.[46]

Fraser appealed the appeal tribunal's decision to the Graduate School's then Dean, Regina Vasilatos-Younken (the "Graduate School Dean").[47] The Graduate School Dean issued her own decision affirming the appeal tribunal's decision to affirm the thesis Committee's decision.[48] At that point, Fraser had exhausted all administrative University remedies available to him.[49]

---

[41] *Id.* ¶ 153.
[42] *Id.* ¶ 150.
[43] *Id.* ¶ 155, 157.
[44] *Id.* ¶ 163.
[45] *Id.* ¶ 165.
[46] *Id.* ¶ 166. The Complaint does not allege what these reasons were.
[47] *Id.* ¶¶ 173-74.
[48] *Id.*
[49] *Id.* ¶ 156.

### B.    Procedural History

Fraser filed suit against the University, Paulson, Rolls, Read, Keystone Nano, and Dr. Mark Kester on May 17, 2022.[50] On August 15, 2022, Fraser filed a Notice of Suggestion of Death indicating that Kester died on or about July 20, 2022.[51] The University, Paulson, Rolls, and Read (the "University Defendants") jointly moved to dismiss the Complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6) on July 18, 2022,[52] and Defendant Keystone Nano filed its own motion to dismiss under Rule 12(b)(6) on September 14, 2022.[53] Both motions have been fully briefed and are now ripe for disposition.[54]

## II.    LAW

Under Federal Rule of Civil Procedure 12(b)(6), the Court dismisses a complaint, in whole or in part, if the plaintiff fails to "state a claim upon which relief can be granted." Following *Bell Atlantic Corp. v. Twombly*[55] and *Ashcroft v. Iqbal*[56], "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"[57] In deciding a motion to dismiss, courts within the United States Court of Appeals for the Third Circuit must follow three steps: (1) take note of the elements the plaintiff must plead

---

[50]   Doc. 1.
[51]   Doc. 20.
[52]   Doc. 12.
[53]   Doc. 26.
[54]   Docs. 12, 15, 24, 25, 26, 27, 28, 29.
[55]   550 U.S. 544 (2007).
[56]   556 U.S. 662 (2009).
[57]   *Id.* at 678 (quoting *Twombly*, 550 U.S. at 570).

to state a claim; (2) identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth; and (3) assume the veracity of all well-pleaded factual allegations and determine whether they plausibly give rise to an entitlement to relief.[58]

## III.   ANALYSIS

Fraser's Complaint asserts the following counts:

- (1) retaliation for constitutionally-protected speech under to 42 U.S.C. § 1983
- (2) denial of constitutionally-protected substantive due process pursuant to 42 U.S.C. § 1983
- (3 and 4) separate denials of constitutionally-protected due process
- (5) breach of contract
- (6) breach of the implied covenant of good faith and fair dealing
- (7) promissory estoppel
- (8) defamation
- (9) breach of fiduciary duties
- (10) violation of Pennsylvania Minimum Wage Act
- (11) violation of Pennsylvania wage payment and collection law
- (12) breach of implied contract and unjust enrichment
- (13) failure to maintain employment and payment record
- (14) failure to pay minimum wage in violation of the FLSA
- (15) failure to pay overtime in violation of the FLSA
- (16) failure to maintain time records in violation of the FLSA.[59]

Counts 1-7 are asserted against the University Defendants. Counts 8 and 9 are asserted against the University and Paulson. Counts 10-16 are asserted against the University, Paulson, and Keystone Nano. In an opposition brief, Fraser voluntarily

---

[58] *Connelly v. Lane Construction Corp.*, 809 F.3d 780, 787 (3d Cir. 2016) (internal quotations and citations omitted).

[59] Doc. 1 ¶¶ 186-313.

dismissed counts 9, 13, 15, and 16.[60] Accordingly, the Court dismisses counts 9, 13, 15, and 16 without prejudice, and now turns to the remaining causes of action.

### A.   Constitutional Claims

Fraser brings four causes of action under 42 U.S.C. § 1983 against the University Defendants alleging violations of Fraser's rights under the First Amendment, substantive due process, and procedural due process.[61] Each fails to satisfy the pleading standard for reasons set forth below.

### 1.   First Amendment

Fraser argues that he "engaged in protected acts of speech and petitioning activity when he commented on a matter of public concern, specifically by bringing perceived abuse of Penn State resources and federal funds by Dr. Paulson to the attention of relevant parties within the Penn State administrative structure."[62] Fraser alleges that, in response, "Dr. Paulson, both individually and in concert with other Defendants, took adverse action against Mr. Fraser for his acts of protected speech sufficient to chill a person of ordinary firmness from continuing that activity, including, but not limited to, losses of privileges and culminating in his termination from his position in the Program."[63]

---

[60] Doc. 24 (opposition to the University Defendants' Motion to Dismiss (Doc. 12)) at p. 33.
[61] Doc. 1 ¶¶ 186-233.
[62] *Id.* ¶ 189.
[63] *Id.* ¶ 190.

The University Defendants argue that the Complaint "includes only a bare, conclusory allegation in support of [Fraser's] First Amendment claim," and that "[t]here is no proximate link" between Fraser's complaints about Paulson and his termination from the Program; Fraser complained about Paulson in 2017 and was not terminated until three years later in 2020.[64] The University Defendants contend that, even if Fraser's speech had been protected, he fails to set forth allegations that his 2017 complaint about Paulson was the cause of his 2020 termination or other alleged harm.[65] The Court agrees with the University Defendants that the claim should be dismissed.

To establish a Section 1983 First Amendment retaliation claim, a plaintiff must show: (1) the plaintiff participated in activity protected by the First Amendment; (2) the defendant retaliated against the plaintiff in a manner that would be sufficient to deter a person of ordinary firmness from exercising his constitutional rights; and (3) a causal nexus between the protected activity and the retaliation.[66]

The Court will first determine whether the Complaint sufficiently pleads facts demonstrating that Fraser's speech was protected by the First Amendment and involving a "matter of public concern" as the Complaint alleges. "Whether an employee's speech addresses a matter of public concern must be determined by the

---

[64] Doc. 15 at pp. 13-14.

[65] *Id.* at p. 14.

[66] *Thomas v. Independence Twp.*, 463 F.3d 285, 296 (3d Cir. 2006) (citing *Mitchell v. Horn*, 318 F.3d 523, 530 (3d Cir. 2003) (internal quotations omitted)).

content, form, and context of a given statement[.]"[67] "The content of speech on a matter of public concern generally addresses a social or political concern of the community[.]"[68]

In contrast, speech on matters of purely private concern is of less First Amendment concern "because [t]here is no threat to the free and robust debate of public issues; there is no potential interference with a meaningful dialogue of ideas concerning self-government; and there is no threat of liability causing a reaction of self-censorship by the press."[69] Speech on matters of public concern "[goes] to the core of the First Amendment because it adds to the debate on matters of public importance."[70] The Third Circuit has held that speech related to the "personal grievance of one student" does not involve a matter of public concern.[71]

Here, Fraser's 2017 complaint about Paulson's alleged conduct does not constitute speech on a matter of public concern and does not share characteristics with the kinds of speech that that courts have placed into the "public concern" category.[72] Rather, his complaint relates to the personal grievance of one student—Fraser. He complained about how Paulson treated him specifically, and his

---

[67] *Connick v. Meyers*, 461 U.S. 138, 147-48 (1983); *see also Miller v. Clinton County*, 544 F.3d 542, 548 (3d Cir. 2008).

[68] *Borden v. Sch. Dist. of the Twp. of East Brunswick*, 523 F.3d 153, 169-70 (3d Cir. 2008).

[69] *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 759-60 (1985) (internal quotations omitted).

[70] *Borden*, 523 F.3d at 170.

[71] *Gorum v. Sessoms*, 561 F.3d 179, 187 (3d Cir. 2009).

[72] *See Borden*, 523 F.3d at 170 (discussing examples of speech found to be on matters of public concern).

complaint was limited to his own one-on-one relationship with his thesis advisor; his speech did not relate to a "broad social or policy" issue at the University.[73] Further, Fraser does not allege that Paulson "breach[ed] the public trust" in a manner that would meaningfully affect the greater University community.[74] Fraser's speech only concerned his own personal circumstances and relationship with Dr. Paulson— nothing more. Therefore, the Court finds that the Complaint fails to sufficiently plead facts demonstrating that Fraser's speech was protected by the First Amendment. [75]

Because the Court finds that the Complaint fails to sufficiently plead facts demonstrating the Fraser's speech was protected by the First Amendment, the University Defendants' Motion to Dismiss is granted as to Count One.

## 2.   **Substantive Due Process**

In Count Two, Fraser alleges that he has a "constitutionally-protected interest in his pursuit of an education" and a "constitutionally-protected property interest in

---

[73] *Sanguigni v. Pittsburgh Bd. of Pub. Educ.*, 968 F.2d 393, 397 (3d Cir. 1992) (internal citations and quotations omitted).

[74] *Connick*, 461 U.S. at 148.

[75] Setting aside Fraser's inability to demonstrate the protected nature of his speech, he also cannot show that his complaint about Paulson was a substantial factor behind the University and the Professors' decision to dismiss him from the Program. Additionally, "[t]o establish the requisite causal connection a plaintiff must prove either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link." *Lauren v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007). The Court notes that it finds the University Defendants' argument regarding temporal proximity persuasive. A span of three years stretches far beyond what the Court could consider temporal proximity sufficient to establish causation for a Section 1983 First Amendment claim. *See Michalesko v. Freeland Borough*, 18 F. Supp. 3d 609, 622 (M.D. Pa. Apr. 29, 2014) (finding three-month lapse between speech and alleged retaliatory conduct insufficient to establish causation).

his continued enrollment in the Program," and was therefore "entitled to both notice and a hearing before his dismissal from the Program."[76] He alleges that his dismissal, which "constitutes state action," took place without any notice or hearing opportunity, depriving him of a "constitutionally-protected interest[,] without due process."[77] The University Defendants argue that "the right to continued graduate education is not protected by substantive due process," and that "[e]ven if the right to a graduate education did have such due process protection, Fraser's claim still fails because he has not, and cannot, allege an arbitrary exercise of authority."[78] The Court agrees with the University Defendants.

A plaintiff bringing a substantive due process claim under Section 1983 must establish as a threshold matter that he has a protected property interest to which the Fourteenth Amendment's due process protection applies.[79] "[A] plaintiff must have been deprived of a particular quality of property interest,"[80] and "[w]hether a certain property interest embodies this 'particular quality' is not determined by reference to state law, but rather depends on whether that interest is 'fundamental' under the United States Constitution."[81] The Third Circuit has stated:

---

[76]   Doc. 1. ¶¶ 196-97, 201.
[77]   *Id.* ¶¶ 204-06.
[78]   Doc. 15 pp. 14-15.
[79]   *Winter v. Pa. Sate Univ.*, 172 F. Supp. 3d 756, 772 (M.D. Pa. 2016) (citing *Nicholas v. Pa. State Univ., et. al.*, 227 F.3d 133, 138-39 (3d Cir. 2000)).
[80]   *Id.*
[81]   *Id.*

> [W]hen a plaintiff challenges a non-legislative state action (such as an adverse employment decision), we must look, as a threshold matter, to whether the property interest being deprived is 'fundamental' under the Constitution. If it is, then substantive due process protects the plaintiff from arbitrary or irrational deprivation, regardless of the adequacy of procedures used. If the interest is not 'fundamental,' however, the governmental action is entirely outside the ambit of substantive due process and will be upheld so long as the state satisfies the requirements of procedural due process.[82]

Further, to prevail on a substantive due process claim, "a plaintiff must show that she was deprived of a fundamental right through an arbitrary and deliberate abuse of authority."[83] "[The Third Circuit] has strongly suggested that the right to continued graduate education is not protected by substantive due process."[84] The Third Circuit has also found that substantive due process rights are not violated when an educational institution's decision is not "beyond the pale of reasoned academic decision-making or otherwise the result of an arbitrary and deliberate abuse of authority."[85] Finally, "[w]hen judges are asked to review the substance of a genuinely academic decision," they "should show great respect for the faculty's professional judgment . . . they may not override it unless it is such a substantial

---

[82] *Id.*

[83] *Elansari v. United States*, 823 F. App'x. 107, 112 (3d Cir. 2020) (citing *Indep. Enter., Inc. v. Pittsburgh Water and Sewer Auth.*, 103 F.3d 1165, 1179-80 (3d Cir. 1997)).

[84] *Manning v. Temple Univ.*, 158 F. App'x. 509, 514 (3d Cir. 2005) (citing *Mauriello v. Univ. of Medicine and Dentistry of N.J.*, 781 F.2d 46, 50 (3d Cir. 1986) (noting that such an interest "bears little resemblance to the fundamental interests that previously have been viewed as implicitly protected by the Constitution") (quoting *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 229-30 (1985) (Powell, J., concurring)).

[85] *Elansari*, 823 Fed. Appx. at 112 (citing *Ewing*, 474 U.S. at 228 (internal quotations omitted)).

departure from academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment."[86]

Here, the Complaint fails to demonstrate that Defendants' alleged conduct demonstrates an arbitrary abuse of authority. The facts alleged state that Fraser had two opportunities to defend his thesis. Prior to his first presentation, Defendants informed Fraser of what the Committee expected in terms of both the written document and the presentation. After Frasier failed his first attempt, Defendants informed Fraser of the reason why, and provided additional guidance regarding what the Committee expected for the second attempt. After Fraser's second attempt, the Committee failed him a second time and again provided him with the reasons why (*e.g.*, Fraser had not been able to answer certain questions, and had made conclusions that extended beyond the data presented). Due to these back-to-back failures, the Committee and University dismissed Fraser from the Program; after they did so, he was afforded an opportunity to appeal his expulsion via a robust process that ultimately gave him an audience with Graduate School Dean herself.

Additionally, "[t]o establish a substantive due process claim, a plaintiff must prove the particular interest at issue is protected by the substantive due process clause and the government's deprivation of that protected interest shocks the

---

[86] *Ewing*, 474 U.S. at 225.

conscience."[87] "Substantive due process does not target government actions that are merely taken for an 'improper purpose' or in 'bad faith' . . . 'Conscience shocking' actions go beyond actions compensable in ordinary intentional and negligent tort law."[88]

Fraser's allegations, even when viewed in the light most favorable to him, demonstrate that a state university decided to dismiss a graduate student after a panel consisting of multiple educated professors found the student's thesis presentation deficient on two separate occasions. These allegations do not go "beyond the pale of reasoned academic decision-making" or demonstrate a conscience-shocking "departure from academic norms."[89] Indeed, this Court has been presented with even more shocking allegations that it did not find to have risen to the level of a substantive due process violation, including a case where a teacher was alleged to have shown up to a student's house to curse at the student and call the student's family names.[90]

---

[87] *Walsh v. Krantz*, No. 1:07-CV-0616, 2008 U.S. Dist. LEXIS 44204, at *33 (M.D. Pa. June 4, 2008) (citing *Chainey v. Street*, 523 F.3d 200, 219 (3d Cir. 2008) (citing *United Artists Theatre Circuit, Inc. v. Twp. of Warrington*, 316 F.3d 392, 400-02 (3d Cir. 2003)).

[88] *Id.* at *33-34 (internal citations and quotations omitted).

[89] *See, e.g.*, *Mauriello*, 781 F.2d at 50 (plaintiff had been informed of her academic deficiencies, given an opportunity to rectify them, and was allowed to present her grievance to the graduate committee); *Kadakia v. Rutgers*, 633 F. App'x. 83, 87 (3d Cir. 2015) (affirming dismissal of substantive due process claim because student was dismissed for "legitimate academic reasons"—he had received a failing grade in three courses and was warned by the school); *McMahon v. Salmond*, 573 F. App'x. 128, 133-34 (3d Cir. 2014) (affirming dismissal of substantive due process claim because student had low grades and was dismissed after failing to improve them).

[90] *See Walsh*, 2008 U.S. Dist. LEXIS at *36.

Because the Court finds that the Complaint fails to sufficiently plead facts demonstrating that the University Defendants' conduct deprived Fraser of a fundamental right through an arbitrary and deliberate abuse of authority, the University Defendants' Motion to Dismiss is granted as to Count Two.

### 3.     Procedural Due Process

Fraser asserts that his procedural due process rights were violated at two stages: (1) when he was dismissed from the Program; and (2) during the appeals process. First, he alleges that the decision expel him was "based in substantial part upon unsubstantiated accusations by Dr. Paulson that Mr. Fraser had fabricated data," and that he was "not put on notice or given an opportunity to be heard on the topic of the alleged data fabrication matter."[91] Second, Fraser alleges that his appeal tribunal was "made up of the very same faculty members who were the subject of Fraser's complaints on appeal in the first instance," and that those members "had a vested interest in upholding the decision of the dissertation Committee and protecting their professional reputations."[92] According to Fraser, the Committee members' failure to recuse themselves from the appeal proceeding deprived him of a constitutionally-protected interest without due process.[93]

The University Defendants argue that "there are no formal requirements" for "academic decisions," such as the decision to dismiss Fraser from the Program, and

---

[91]   Doc. 1 ¶ 213, 215.
[92]   *Id.* ¶¶ 228-29.
[93]   *Id.* ¶ 232.

that Fraser was permitted to appeal the Committee's decision to the Graduate School Dean, an "impartial decisionmaker" in the process who had not been an active participant in the alleged misconduct of Defendants.[94] According to the University Defendants, because Fraser had the opportunity to appeal his decision to the Graduate School Dean, Fraser was "provided with more procedural safeguards than required" for a procedural due process claim.[95] The Court agrees with the University Defendants.

Due process is a "flexible concept and the process due in any situation is to be determined by weighing: (1) the private interests at stake; (2) the governmental interests at stake; and (3) the fairness and reliability of the existing procedures and the probable value, if any, of additional procedural safeguards."[96] "The Due Process Clause protects students during disciplinary hearings at public institutions," but with that said, "[t]here is not a specific format that these proceedings have to follow, so long as the university provides sufficient protections to comply with due process."[97]

Procedural due process "requires that a deprivation of life, liberty, or property be preceded by notice and opportunity for hearing appropriate to the nature of the

---

[94] Doc. 15 at p. 19.
[95] *Id.*
[96] *Palmer v. Merluzzi*, 868 F.2d 90, 95 (3d Cir. 1989) (citing *Mathews v. Eldridge*, 424 U.S. 319 (1976)).
[97] *Van Le v. Univ. of Med. & Dentistry*, 379 F. App'x. 171, 174 (citing *Sill v. Pa. State Univ.*, 462 F.2d 463, 469 (3d Cir. 1972)).

case," and the type of notice and hearing "depends on the context."[98] In the academic context, "more informal forms of notice and hearings suffice."[99] If a university dismisses a student for academic reasons, "it need only provide an informal give-and-take between the student and the administrative body responsible for the dismissal."[100]

In the context of due process rights for students within state universities, the Third Circuit has stated: "[C]ourts are generally ill-equipped to review subjective academic appraisals of educational institutions, and [the Supreme Court] admonished courts to permit university faculties a wide range of discretion in making judgments as to the academic performance of students."[101] Further, "[t]he fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner" by "an impartial decisionmaker"—those decisionmakers are "presumed to be impartial, and only evidence of 'actual bias or a likelihood of bias' can support a due process claim."[102] And that alleged prejudice "must be based on more than mere speculation and tenuous inferences."[103]

---

[98]   *Keles v. Bender*, No. 21-1497, 2022 U.S. App. LEXIS 7373, at *8 (3d Cir. March 18, 2022) (internal citations omitted).

[99]   *Id*.

[100]   *Id*.

[101]   *Hankins v. Temple Univ.*, 829 F.2d 437, 444 (3d Cir. 1987) (citing *Bd. of Curators of the Univ. of Mo. v. Horowitz*, 432 U.S. 78, 98 (1978); *Ewing*, 474 U.S. at 214.

[102]   *Park v. Temple Univ*, 757 F. App'x 102, 106 (3d Cir. 2018) (citing *Sill*, 462 F.2d at 469).

[103]   *Osei v. Temple Univ.*, No. 10-2042, 2011 U.S. Dist. LEXIS 113431, at *11 (E.D. Pa. Sept. 30, 2011), *aff'd* 518 F. App'x 86 (3d Cir. 2013).

Here, the allegations do not defeat the "wide range of discretion" that the Court is required to give the University's academic judgment. First, Fraser alleges that he was deprived of procedural due process when he was dismissed from the Program on the ground that he had fabricated data. However, the facts alleged indicate that Fraser was informed of the specifications that his uploaded data needed to meet, and that Fraser then uploaded that data.[104] The facts alleged then indicate that Fraser was dismissed from the Program because he had "made conclusions that extended far beyond the data presented."[105] All of this took place after Fraser had previously failed his first attempt to defend his thesis.

As the Third Circuit has advised, this Court is "ill-equipped" to review the academic basis of the Committee's decision,[106] which is whether Fraser's conclusions actually went beyond the data. Even when viewed in the light most favorable to Fraser, the facts alleged demonstrate that the Committee informed Fraser of what they expected of him, provided feedback throughout the drafting process, attended his thesis presentation, and made an academic decision to dismiss him from the Program after—in the Committee's judgment—he had failed to sufficiently defend his thesis on more than one occasion. The Court is required to give the University a wide range of discretion to make such decisions, and the

---

[104] Doc. 1 ¶¶ 121 ("Dean Ades emailed Mr. Fraser with instructions regarding how to structure his data files for the upcoming oral defense."), 124 ("Mr. Fraser had completed this request and uploaded the data[.]").

[105] Doc. 1 ¶ 153.

[106] *Hankins*, 829 F.2d at 444 (citing *Horowitz*, 432 U.S. at 98; *Ewing*, 474 U.S. at 214).

Complaint fails to sufficiently plead facts persuading the Court not to do so in this case.

Second, Fraser alleges that he was deprived of procedural due process throughout the appeal process because his tribunal panel was made up of the very Committee members who he alleges acted in bad faith against him. But this claim ignores one essential piece of Fraser's own factual allegations: the appeals process did not end with those allegedly biased professors, nor was the final decision made by them. Indeed, the Complaint alleges that "[s]hortly after reviewing the decision of the Appeal Committee," Fraser "appealed the results of his appeal, this time to the office of the Dean of the Penn State Graduate School, Dr. Regina Vasilatos-Younken."[107] The Graduate School Dean, who was not a member of the Program or of Fraser's thesis Committee, ultimately affirmed the appeal tribunal's decision.[108]

While the Court notes that the facts alleged about the first step of the appeal (*i.e.*, the part where Fraser was expected to present his appeal to the very actors he alleged had treated him unfairly) sufficiently rebuts any presumption that the appeal tribunal's initial decision was impartial,[109] the balance of the account indicates that the appeal process as a whole gave Fraser the opportunity to be heard in a meaningful time and manner by an impartial decisionmaker.  The Court is to presume that Dr.

---

[107] *Id.* ¶ 173.

[108] *Id.* ¶174.

[109] *Id.* ¶¶ 157 (the fact that the appeal tribunal was made up of the professors whose conduct was key to Fraser's allegations), 163 (the fact that the appeal moderator had to tell Paulson and Rolls to "keep things civil" during Fraser's presentation).

Vasilatos-Younken's decision to affirm the appeal tribunal's decision was an impartial one, and the Complaint is bereft of any facts rebutting that presumption by calling the Graduate School Dean's impartiality into question.[110]

Taken as a whole, the appeals process as alleged satisfies the "informal give-and-take" required for procedural due process, and the Complaint fails to plead facts demonstrating that Fraser was deprived of procedural due process during the appeal process. Therefore, the University Defendants' Motion to Dismiss is granted as to Counts Three and Four.

### B.     Fair Labor Standards Act

Fraser's only remaining claim under federal law is Count 14, which alleges that the University, Paulson, and Keystone Nano failed to pay minimum wage under the FLSA.[111] Fraser alleges that "[the University] and Keystone Nano failed to pay Mr. Fraser for all hours worked by Mr. Fraser outside the scope of his Ph.D. program."[112] These Defendants argue that Fraser's allegations fail to establish requisite elements of an FLSA wages claim.[113] The Court agrees with these Defendants.

---

[110] *See Tshudy v. Pa. State Univ.*, No. 4:22-CV-01431, 2022 U.S. Dist. LEXIS 210040, at *8 (M.D. Pa. Nov. 18, 2022) (dismissing procedural due process claim because law student had failed to demonstrate that law school's appeal process was not impartial).

[111] *Id.* ¶¶ 305-07.

[112] *Id.* ¶ 306.

[113] Doc. 15 at pp. 33-35; Doc. 27 at pp. 6-14.

"A *prima facie* case under the FLSA requires the plaintiff to allege: (1) he was an 'employee,' as defined by the FLSA; (2) the defendant was 'engaged in commerce,' as defined by the FLSA; and (3) he was not paid the federal minimum wage or was not paid overtime compensation for the hours worked in excess of forty in a given week."[114] Under the Act, an "employee" is "any individual employed by an employer."[115] An "employer" is "any person acting directly or indirectly in the interest of an employer in relation to an employee."[116] "It is the plaintiff's burden to prove that his or her employer is covered under the FLSA in order to succeed on the merits."[117]

In the Third Circuit, courts apply an "economic reality" test that "examines whether, under the totality of the circumstances, the employer exerts significant control over the employees[,]" and factors establishing control "may include but are not limited to authority to hire and fire employees; authority to promulgate rules and assignments; authority to set conditions of employment, including compensation, benefits, and hours; day-to-day supervision; and control of employee records."[118]

---

[114] *Pleickhardt v. Major Motors of Pa., Inc.*, No. 3:17-CV-0375, 2017 U.S. Dist. LEXIS 153963, at *8 (M.D. Pa. Sept. 21, 2017) (internal citations omitted).

[115] 29 U.S.C. § 203(e)(1).

[116] *Id.* § 203(d).

[117] *Quagliariello v. Dipasquale*, No. 3:20-cv-699, 2021 U.S. Dist LEXIS 25175, at *15 (M.D. Pa. Feb. 9, 2021) (quoting *Katz v. DNC Servs. Corp.*, No. 16-5800, 2018 U.S. Dist. LEXIS 17002, at *5 (E.D. Pa. Feb. 2, 2018) (adopted by *Quagliariello v. Dipasquale*, No. 3:20-cv-699, 2021 U.S. Dist. LEXIS 107620 (M.D. Pa. Feb. 26, 2021).

[118] *Scalia v. Valley Hotel, Inc.*, No. 4:17-CV-00113, 2020 U.S. Dist. LEXIS 8198, *5 (M.D. Pa. Jan. 17, 2020).

Applying the "economic reality test" here, Fraser has failed to plead any facts that Keystone Nano exerted any significant control over Fraser. At most, the Court interprets the Complaint to allege that Paulson was affiliated with Keystone Nano, and that the alleged extracurricular work Paulson required Fraser to complete somehow benefitted Keystone Nano. This is not enough to establish that Keystone Nano exercised any "control" over Fraser or operated as Fraser's "employer" in any plausible manner.[119] The Court therefore grants Keystone Nano's Motion to Dismiss Count 14.

As for the claim as it remains against the University and Paulson, the Complaint does not plausibly allege facts that would allow the Court to determine if an employer-employee relationship existed between these Defendants and Fraser. The Third Circuit has used a six-factor test to determine whether a person is a worker under the FLSA:

> (1) the degree of the alleged employer's right to control the manner in which the work is to be performed; (2) the alleged employee's opportunity for profit or loss depending upon his managerial skill; (3) the alleged employee's investment in equipment or materials required for his task, or his employment of helpers; (4) whether the service rendered required a special skill; (5) the degree of permanence of the working relationship; (6) whether the service rendered is an integral part of the alleged employer's business.[120]

---

[119]   *See Scalia*, 2020 U.S. Dist. LEXIS at *5.
[120]   *Razak v. Uber Techs., Inc.*, 951 F.3d 137, 142-43 (3d Cir. 2020).

However, "neither the presence nor absence of any particular factor is dispositive,"[121] and "courts should examine the circumstances of the whole activity, determining whether as a matter of economic reality, the individuals are dependent upon the business to which they render service."[122] A plaintiff has the burden to prove that he or she is an employee."[123]

The primary reason the Court must dismiss this claim is because the Complaint simply does not allege enough facts about Fraser's employment situation. And the Court cannot apply and weigh the above factors unless it has enough facts to guide that analysis. By way of example, Fraser alleges that he was a graduate student who received a "stipend" from the University, but the Court cannot infer what that stipend was intended to pay for or what—if anything—the University expected from Fraser in return for the stipend (*e.g.*, to focus solely on his thesis, teach classes, assist professors in labs, etc.).

Fraser alleges that he "worked" in Paulson's lab, but the core of his 2017 complaint against Paulson was that he was required to do work that was not relevant to his own thesis; it is unclear, then, whether Fraser expected work in "Paulson's lab" to include any work relevant to Paulson. The Court is left to speculate as to the contours of the pair's working arrangement, including what either party expected from Fraser's agreement to "work" in Paulson's lab, whether Fraser was promised

---

[121] *Id.* at 143 (internal citations and quotations omitted).
[122] *Id.*
[123] *Id.*

or expected payment, and whether any of this work was tied to or included in his stipend from the University. If the arrangement was more akin to an apprenticeship or mentorship opportunity, courts have been reluctant to squarely place such training and mentorship arrangements within the purview of the FLSA.[124] The Complaint is also devoid of any general information that would help the Court to understand when, if at all, a graduate student is expected to work versus study, and how the graduate community at Penn State differentiates between the two roles a graduate student can play. Put plainly, Fraser fails to define the scope of his work for both the University and for Paulson. If those facts exist, Fraser must allege them.

Looking at the Complaint's specific language, it alleges that "[p]ursuant to his thesis work, Mr. Fraser began working in Dr. Paulson's lab at Penn State," and that "[s]hortly thereafter, Dr. Paulson began tasking Mr. Fraser with additional responsibilities that were beyond the scope of his fellowship and thesis duties."[125] Fraser alleges that he was not paid for these responsibilities, which included "providing philosophical and material experimental support for other students in the lab, as well as over a thousand hours of leukemia research work that, upon information and belief, furthered the pecuniary interests of Paulson and his private business enterprises independent of Penn State."[126]

---

[124] *See*, *e.g.*, *Jochim v. Jean Madeline Educ. Ctr. of Cosmetology, Inc.*, 98 F. Supp. 3d 750, 756 (E.D. Pa. 2015) ("[T]he FLSA does not transform every training relationship into an employer-employee relationship.").

[125] Doc. 1

[126] *Id.* ¶ 24.

As stated above, the six factors discussed in *Razak v. Uber Technologies, Inc.* are not of much assistance to the Court because there are too many unknowns within the allegations. Be that as it may, a rudimentary run-through of some of the factors weighs in favor of finding that Fraser was not an "employee" as contemplated by the FLSA. While it is likely that Paulson and the University control the manner of the work performed in University labs, there is no indication that there were "profits" or "losses" to be obtained by Fraser in his role as a graduate student lab assistant. It is not alleged, and is also implausible to imagine, that Fraser was expected to invest in the University's and Paulson's laboratory materials. The Complaint makes no allegations about the skills required for the position, about the permanence of the role, or about whether the work Fraser performed was integral to either the University's or Paulson's business.

Accordingly, the Court finds that the allegations do not sufficiently plead a cause of action under the FLSA. The University and Paulson's Motion to Dismiss Count 14 is granted.

### C.    Remaining State Law Claims.

Fraser brings seven additional claims arising under Pennsylvania state law.[127] In the event that Fraser fails to successfully amend his complaint, the Court will decline to exercise its supplemental jurisdiction governing the issues underlying these claims.

---

[127]  Counts V, VI, VII, VIII, X, XI, and XII.

## IV.    CONCLUSION

For the reasons stated above, the University Defendants' Motion to Dismiss the Complaint (Doc. 12) and Keystone Nano's Motion to Dismiss the Complaint (Doc. 26) are GRANTED, and Fraser's Complaint (Doc. 1) is DISMISSED without prejudice.

An appropriate Order follows.

BY THE COURT:

_s/ Matthew W. Brann_
Matthew W. Brann
Chief United States District Judge