# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JAMES FRASER, | No. 4:22-CV-00726 |
| Plaintiff, | (Chief Judge Brann) |
| v. | |
| THE PENNSYLVANIA STATE UNIVERSITY, a Pennsylvania education institution; DR. ROBERT PAULSON, an individual, in his official and individual capacities; DR. MELISSA ROLLS, an individual, in her official and individual capacities; DR. ANDREW READ, an individual, in his official and individual capacities; and KEYSTONE NANO, INC. a Pennsylvania business corporation, | |
| Defendants. | |

## MEMORANDUM OPINION

### JULY 7, 2023

Six months ago, this Court dismissed Plaintiff James Fraser's initial Complaint in which Fraser alleged, among other things, violations of his free speech and due process rights as well as violations of the Fair Labor Standards Act. Fraser, a former Ph.D. candidate at The Pennsylvania State University, is now back with an Amended Complaint. The claims and the Defendants[1] are essentially the

---

[1]    Penn State and three members of the University's faculty—Dr. Robert Paulson, Dr. Melissa Rolls, and Dr. Andrew Read—as well as Keystone Nano, Inc., an independent company allegedly connected to both Penn State and Dr. Paulson.

same, but the pleadings have changed substantially. For some claims, Fraser

provides additional factual allegations. For others, Fraser tells an entirely new

story. But, for all his efforts to remedy the deficiencies that defeated his initial

Complaint, Fraser finds himself in the same spot: he has failed to allege a viable

federal cause of action. Accordingly, the Amended Complaint is dismissed—this

time with prejudice.

## I.   BACKGROUND

### A.   Fraser's Doctoral Program and Funding Sources

Fraser began his doctoral studies at Penn State in 2014, pursuing his Ph.D. in

the University's Molecular, Cellular, and Integrative Biosciences Graduate

Program.[2] He completed the required coursework and then passed his qualifying

and comprehensive examinations on December 17, 2015, and November 21, 2016,

respectively, thereby allowing him to begin his doctoral candidacy.[3] And to that

end, Dr. Robert Paulson, a Penn State faculty member within the University's

Department of Veterinary and Biomedical Sciences, served as Fraser's thesis

advisor.[4] In that capacity, Dr. Paulson supervised Fraser's doctoral studies and

served on his Dissertation Committee—the group of professors responsible for

assessing Fraser's performance in the program and determining whether his work

---

[2]   Doc. 33 (Am. Compl.) ¶¶ 5, 12.
[3]   *Id*. ¶ 19.
[4]   *Id*. ¶¶ 7, 23.

2

ultimately merited the Ph.D.[5] In addition to Dr. Paulson, Fraser's Dissertation

Committee included Dr. Andrew Read and Dr. Melissa Rolls, professors within the

Penn State's Department of Entomology and Department of Biochemistry and

Molecular Biology, respectively.[6]

During Fraser's time at Penn State, his costs associated with his doctoral

program were covered by three separate sources of income: a stipend provided by

Penn State, a fellowship through the National Institutes of Health ("NIH"), and a

stipend financed by Dr. Read.[7] The funding stream differed each academic year:

| Academic Year | Funding Type | Funding Source | Associated Work |
|---|---|---|---|
| 2015–16[8] | Stipend | Penn State Department of Biology | Teaching Assistant |
| 2016–17[9] | Fellowship | NIH | Thesis research, additional coursework, and a workshop |

---

[5]   *Id.* ¶¶ 23, 259–60.
[6]   *Id.* ¶¶ 8–9, 71, 290.
[7]   *Id.* ¶ 24.
[8]   *Id.* ¶ 25.
[9]   *Id.* ¶ 28. For this fellowship (known as an "NIHT32 grant and fellowship"), NIH provided
       funding to Penn State to "enhance the training of academically gifted students who, like
       [Fraser], applied to be awarded the fellowship." *Id.*

| 2017–18[10] | Fellowship | NIH | Thesis research, additional coursework, and a workshop |
|---|---|---|---|
| 2018–19[11] | Stipend | Penn State Department of Microbiology | Teaching Assistant |
| 2019–20[12] | Stipend | Dr. Read | Thesis research |

According to Fraser, as a term of both the Penn State stipends and the NIH fellowship, he was "not permitted [or] expected to perform any tasks outside thesis work, except by permission and rationale."[13] It is unclear, however, how this prohibition comports with other requirements of both the funding streams and the Molecular, Cellular, and Integrative Biosciences Graduate Program through which Fraser was pursuing his Ph.D. For example, Fraser alleges that "[t]o remain in good standing with the [NIH] fellowship, students were encouraged to publish papers, apply for and attend conferences, and seek awards and recognition that could be used as statistics to renew the Program's funding in subsequent years."[14] There is no indication that the papers, conferences, or awards were limited to topics directly related to a fellowship recipient's thesis.

---

[10]   Doc. 33 (Am. Compl.) ¶ 31.

[11]   *Id*. ¶ 34.

[12]   *Id*. ¶ 37. According to Fraser, this stipend "was covered by Dr. Read from his own money, as well as grant money Dr. Read and Dr. Paulson received from Mr. Fraser's work on malaria." *Id*.

[13]   Doc. 33 (Am. Compl.) ¶ 25; *see also id*. ¶ 28 ("As per the NIH T32 regulations, students who were awarded this grant were not allowed to perform any work outside their thesis work for any reason.").

[14]   Doc. 33 (Am. Compl.) ¶ 28 (cleaned up).

Separately, Fraser alleges that he was expected to perform laboratory research in Dr. Paulson's lab, conducting experiments supporting Dr. Paulson's independent research and assisting other graduate students' thesis projects.[15] Fraser consistently describes the laboratory work as independent of his doctoral thesis and "outside the scope" of both his own thesis work as well as his stipend and fellowship duties.[16] That said, Fraser emphasizes that if he did not complete the laboratory work, "he would not have passed the Program."[17] Fraser offers no explanation for how the work in Dr. Paulson's lab was simultaneously "outside the scope of his education Program" and a Program requirement.

Similarly, Fraser asserts that he was required to assist in work related to Defendant Keystone Nano, an independent company that allegedly maintains a commercial relationship with both Penn State and Dr. Paulson.[18] Specifically, Fraser provided laboratory support and research assistance to a Penn State post-doctoral fellow and a technician who were conducting "Keystone Nano-related work."[19] Fraser performed this work at Dr. Paulson's direction, and it persisted throughout his time in the doctoral program—regardless of Fraser's funding

---

[15]  *Id*. ¶¶ 26–27, 29–30, 32–33, 35–36.

[16]  *See*, *e.g.*, *id*. ¶ 40 (describing the laboratory work as "outside the scope of his education Program, stipend duties, and fellowship duties") (cleaned up).

[17]  *Id*.; *see also id*. ¶¶ 41–42 (same), 347–49 (same), 389–91 (same).

[18]  Doc. 33 (Am. Compl.) ¶ 27.

[19]  *Id*. ¶ 33 ("Mr. Fraser was expected to assist both postdoc, Diwakar Basthili, and technician, Ian Huffnagle, in all Keystone Nano-related work, including experimental support, mouse care, data analysis, and more, which required bleeding and weighing mice for Mr. Huffnagle, analyzing the blood, etc., as well as helping him analyze and present his data.").

stream.[20] Indeed, Fraser repeatedly emphasizes that the work for Keystone Nano, as with his efforts to assist other doctoral candidates' thesis projects, was "outside the scope" of his academic studies and the duties associated with his stipend and fellowship.[21] But, again, Fraser describes his work for Keystone Nano as essentially a Program requirement and prerequisite for successful completion of his doctorate, stating that "he would not have passed the [P]rogram" if he did not "complete the work."[22]

---

[20] *See id.* ¶¶ 27 (describing Keystone Nano-related work in 2015–16), 30 (Keystone Nano-related work in 2016–17), 33 (Keystone Nano-related work in 2017–18), 36 (Keystone Nano-related work in 2018–19), 38 (Keystone Nano-related work in 2019–20).

[21] *See, e.g., id.* ¶ 41 ("Keystone Nano . . . directed and controlled the manner in which Mr. Fraser performed the work outside the scope of his education Program, stipend duties, and fellowship duties.").

[22] *Id.; see also id.* ¶ 335 ("[D]espite not being an explicit requirement of the Program, Mr. Fraser working for free (effectively as an indentured servant) was an implicit requirement of obtaining his Ph.D.").

To be clear, Fraser alleges that "[t]he work he performed for Penn State and Keystone Nano was not performed as part of his education Program, stiped, or fellowship because it did not add to his progress in his Program or thesis." *Id.* ¶ 43. But there is no attempt to reconcile those contradictory pleadings. Fraser alleges cryptically that "Keystone Nano would have exercised its influence within Penn State through Keystone Nano's relationships with [his] Program Committee Members." *Id.* ¶ 42.

This hypothetical outcome, however, is simply speculation. According to Fraser, Dr. Paulson had a business relationship with Keystone Nano, which in turn "commercialize[d] Penn State's intellectual property." *Id.* ¶¶ 30, 51, 226. But Fraser does not explain the nature of Dr. Paulson's purported commercial relationship with Keystone Nano or how, precisely, Keystone Nano's "commercializ[ing]" of Penn State's intellectual property supposedly rendered the University beholden to the company. Fraser similarly presents no allegations of Keystone Nano exerting influence over Penn State's decisions regarding its doctoral candidates. And, as it relates to Fraser, there is no indication that any member of his Dissertation Committee outside of Dr. Paulson had any relationship with Keystone Nano whatsoever.

As best as the Court can tell, although Fraser's work assisting Dr. Paulson's research (both his independent research and whatever work he performed and oversaw related to Keystone Nano) and his fellow doctoral candidates' thesis projects was unrelated to his thesis, Fraser was expected to provide that assistance and his failure to do so could have jeopardized his standing in the doctoral Program.

According to Fraser, Keystone Nano "directed and controlled the manner in which [he] performed the work" on its behalf, and that it "possessed the power to hire and fire [him]."[23] That said, Fraser does not allege that he entered a formal contractual relationship with Keystone Nano or that Keystone Nano ever compensated (or represented that it would compensate) him for his work.[24] Fraser does not identify anyone at Keystone Nano with whom he spoke during his time at Penn State—either to discuss the overall scope of his work on the company's behalf or any day-to-day obligations and expectations.[25] And although Fraser asserts that Keystone Nano "benefited from [his] work" and references the company's "communications to Penn State and Dr. Paulson," the Amended Complaint is bereft of any details of what Keystone Nano expected of Penn State, how Fraser's work related to those purported expectations, and whether anyone at Keystone Nano was aware that Fraser was performing work for the company.[26]

---

[23]  Doc. 33 (Am. Compl.) ¶ 41.

[24]  *See id*. ¶¶ 23–66.

[25]  *Id*. At one point, Fraser describes Dr. Paulson as an "owner of Keystone Nano." *Id*. ¶ 224. But in a separate section of the Amended Complaint, he identifies an individual named Mark Kester as the "owner of Keystone Nano," and seemingly suggests that Dr. Paulson's sole employer was Penn State. *Id*. ¶ 30; *see also id*. ¶¶ 335 (discussing his "services requested by Dr. Paulson in support of Dr. Kester and his company, Keystone Nano"), 340 ("Penn State, via the actions of Dr. Paulson, its employee, and Keystone Nano, via the actions of Dr. Kester, its employee, willfully failed to pay Mr. Fraser."). It is therefore unclear from the Amended Complaint what relationship (if any) Dr. Paulson had with Keystone Nano. There is no indication that Dr. Paulson had the authority to hire, fire, or direct the work of Keystone Nano employees.

[26]  Doc. 33 (Am. Compl.) ¶¶ 23–66.

## B.      Fraser's Complaints About the Misuse of Public Funds

According to Fraser, he considered the "additional duties" Dr. Paulson assigned him—in particular, the work Fraser performed for Keystone Nano—deeply troubling.[27] Fraser describes the Keystone Nano-related work as "a diversion of Penn State's taxpayer resources [and] his federal taxpayer fellowship monies to the personal benefit of Penn State, Dr. Paulson, and Keystone Nano."[28] Compelled by a sense of "civic obligation," Fraser decided to "take action"—"not for himself, but on behalf of the public and for the public's benefit."[29]

Consequently, in 2017, Fraser reported his concerns to Dr. Rolls and Dr. Read.[30] Fraser explains that "because it was matter of public concern," he thought it best to first raise the issue "in a discreet manner within the [Penn State Biology Department]."[31] Neither Dr. Rolls nor Dr. Read, however, were willing to act on Fraser's complaints; both were purportedly concerned about possible "political reprisal" by Dr. Paulson, who was "extremely influential" in the Department.[32]

---

[27]   *Id*. ¶ 68.

[28]   *Id*.

[29]   *Id*. ¶ 69. The Court notes that this description of his concerns stands in stark contrast with how Fraser characterized the matter in his initial Complaint. There, Fraser alleged that his frustrations stemmed from the fact that he was "not paid" or "given academic credit" for the additional work. Doc. 1 (Compl.) ¶ 25. Fraser framed the matter as "an impermissible conflict of interest between his advisor and the University," emphasizing the "diversion of Penn State resources and his own labor to Dr. Paulson's personal benefit." *Id*. ¶ 27. As such, Fraser alleged, he "felt he had a moral obligation to . . . bring his concerns to the attention of Penn State." ¶ 28.

[30]   Doc. 33 (Am. Compl.) ¶ 71.

[31]   *Id*. ¶ 70.

[32]   *Id*. ¶ 72.

The matter, then, was seemingly dropped. For two years, Fraser continued in his doctoral program, progressing with his thesis while also performing work on behalf of Keystone Nano, without making any additional reports of purported misconduct.[33]

But in April 2019, Dr. Rolls and Dr. Read met with Fraser and "informed [him] that he had two options as to how to proceed in the wake of his reports of public funds, facilities, and resources being misused" (i.e., his complaints from two years prior): (1) "give up all his work completed to that point and start his thesis over, presuming he could find a different advisor willing to take him"; or (2) "file official complaints with the appropriate officials at Penn State."[34] Fraser "opted for the second option and filed official reports of his public concerns with the appropriate Penn State officials."[35] Fraser does not state when, exactly, he filed those "official reports," or what, precisely, he said in those reports. And he likewise does not identify the "appropriate Penn State officials" to whom he sent the complaints.[36]

### C.    Retaliatory Conduct

After receiving Fraser's complaints, Penn State opened an investigation into Dr. Paulson, though little came of it: the University "declined to make any findings

---

[33]    *See id.* ¶¶ 33–36, 73.
[34]    *Id.* ¶¶ 73–74.
[35]    *Id.* ¶ 75.
[36]    *Id.*

or take any action against Dr. Paulson."[37] That said, Dr. Paulson purportedly did not take kindly to Fraser's complaints. According to Fraser, "Dr. Paulson began engaging in increasingly severe retaliatory conduct to keep [Fraser] quiet about the Dr. Paulson-Keystone Nano-Penn State relationship and misuse of public funds, resources, and facilities."[38]

First, on May 30, 2019, Dr. Paulson informed Fraser in writing that he would withhold Fraser's stipend unless he "agreed to follow Dr. Paulson's every direction regardless of whether [he] believed it presented a conflict of interest with Penn State or a violation of his contract with the University."[39] According to Fraser, the letter had a chilling effect: "Fraser was scared to report the further uncompensated work that was outside the scope of his Program that was to the detriment of public funds."[40]

Separately, Dr. Paulson spread false accusations that Fraser failed to credit him on a conference presentation and also repeatedly locked Fraser out of the lab, preventing him from "work[ing] on experiments for his doctoral research."[41] Fraser does not, however, allege when either of those purportedly retaliatory actions occurred. Aside from a single paragraph noting that Dr. Paulson "spread accusations" that were "patently untrue," the Amended Complaint is silent as to

---

[37] *Id*. ¶ 76.
[38] *Id*. ¶ 78.
[39] *Id*. ¶ 79.
[40] *Id*. ¶ 81.
[41] *Id*. ¶¶ 82, 84.

this alleged retaliatory action.[42] And regarding his access to the lab, the only other pleadings in the Amended Complaint on the subject concern "an extensive Title IX investigation" into a purportedly "baseless complaint from a fellow student"; although Fraser was "cleared of all accusations of Title IX violations," he "was barred from being in the lab at the same time as the accusing student and consequently was forced to alter his own research work and schedule to accommodate the complainant, imposing what amounted to a *de facto* restraining order."[43] It is unclear how, if at all, the allegations relate to one another.

Further, Fraser asserts that other members of the Penn State community participated in the retaliation as well. In particular, Fraser highlights Dr. Rolls, who in the fall semester of 2019 "demanded that [Fraser] turn over confidential data regarding his research."[44] Fraser offers no explanation for how that demand relates to his complaints about Dr. Paulson and Keystone Nano; instead, he simply notes that Dr. Rolls had no "legal or contractual authority" to make such demands.[45]

### D.    Fraser's Failed Thesis Defenses

Fraser was first scheduled to defend his thesis in December 2019.[46] Leading up to his defense, Fraser met with members of his Dissertation Committee (presumably Dr. Rolls and Dr. Read), who gave Fraser instruction on what work he

---

[42]  *Id.* ¶ 82.
[43]  *Id.* ¶ 88–90.
[44]  *Id.* ¶ 86.
[45]  *Id.*
[46]  *Id.* ¶ 112.

needed to perform "to successfully defend his thesis and be awarded his Ph.D."[47]
And the week before his defense, Dr. Paulson and Dr. Rolls provided further
feedback on Fraser's thesis—"last minute concerns," in Fraser's telling.[48] Unhappy
with the "polish" of the thesis document—a criticism Fraser's characterizes as
"seemingly arbitrary"—the Dissertation Committee postponed Fraser's defense
until the first week of January 2020, giving Fraser a few extra weeks over the
University's winter break to "write a new version of his thesis document."[49]

After Fraser revised his thesis, Dr. Paulson and Dr. Rolls remained
unsatisfied with Fraser's work, but Dr. Read "stepped in and authorized the
defense to proceed."[50] The result, however, was not in Fraser's favor. Dr. Paulson
and Dr. Rolls "spent much of the presentation bombarding [Fraser] with disruptive
questions" on topics Fraser considered "largely irrelevant" to his thesis.[51]
Ultimately, the Dissertation Committee "failed" Fraser, citing the purportedly
"irrelevant" concerns raised during the defense.[52]

---

[47]   *Id*. ¶ 109.

[48]   *Id*. ¶ 114.

[49]   *Id*. ¶¶ 115, 118–19.

[50]   *Id*. ¶¶ 121–22.

[51]   *Id*. ¶¶ 126–27.

[52]   *Id*. ¶ 128; *see also id.* ¶¶ 138–39 (discussing a letter Fraser received on January 9, 2020, "discussing the outcome of his failed January oral defense," which "ostensibly cited the failure of [Fraser] to field the largely irrelevant questions regarding the lifecycle of the parasite causing Malaria").

Following Fraser's failed first defense, Penn State gave him the opportunity to revise his thesis and defend it a second time.[53] To that end, the University sent Fraser a letter detailing the issues he needed to address.[54] And throughout the spring semester of 2020, Fraser's Dissertation Committee provided feedback on additional revisions he needed to make to ensure a successful defense.[55] Notably, in the weeks before Fraser was set to defend his thesis a second time, the Dissertation Committee "began making increasingly onerous demands regarding access to [Fraser's] supporting data," with Dr. Paulson directing Fraser to "draft and upload detailed explanations of each of the myriad experiments supporting his thesis."[56] For his part, Fraser considered the requests "unnecessary"—a "bad faith stalling tactic" rather than a "legitimate academic concern or inquiry."[57]

Despite the extended back-and-forth with his Dissertation Committee, Fraser asserts that he went "into his oral defense with almost no guidance regarding what was expected of him."[58] And after the defense, Fraser "receive[d] word from the [Dissertation Committee] that they had failed him a second time."[59] The Dissertation Committee provided Fraser with a memo detailing their "reasoning for

---

53   Doc. 33 (Am. Compl.) ¶ 138–85. According to Fraser, Dr. Paulson and Dr. Rolls opposed the decision to grant Fraser a second defense; they instead petitioned for Fraser's expulsion. *See id.* ¶ 151.

54   *See* Doc. 33 (Am. Compl.) ¶¶ 138–41.

55   *See id.* ¶¶ 152–57.

56   *Id.* ¶¶ 158–59.

57   *Id.* ¶ 162.

58   *Id.* ¶¶ 164–65, 176 (describing the "onerous demands" that "no other graduate student at Penn State had been expected to [do]").

59   *Id.* ¶ 191.

failing him," which centered on the fact that "throughout the oral defense, [Fraser] made conclusions that extended far beyond the data presented"—reasoning Fraser contests, as "none of [those] criticisms were provided to [him] prior to his second oral defense, despite his conclusions being expressly stated in his thesis document."[60]

### E.    Appeal Process

After Fraser failed his thesis defense a second time, the Dissertation Committee informed Fraser that he "would be ejected from the Program without the Ph.D."[61] Fraser responded by appealing the decision.[62] Fraser's appeal was first heard by an "Appeal Committee" comprised of certain Penn State faculty members—including the professors on his Dissertation Committee.[63] Fraser met with the Appeal Committee on January 20, 2021, and five days later, the Appeal Committee issued its decision denying Fraser's appeal and affirming the Dissertation Committee's prior determination.[64]

In a written letter announcing its decision, the Appeal Committee explained why it denied Fraser's appeal, noting that the appeal "did not address the primary cause for his failure during the oral defense" and that Fraser "was unwilling to take feedback from the [Dissertation Committee] and incorporate it adequately into his

---

[60]   *Id*. ¶¶ 197–99.
[61]   *Id*. ¶ 192.
[62]   *Id*. ¶ 200.
[63]   *Id*. ¶ 202.
[64]   *Id*. ¶¶ 204–10.

dissertation."[65] Fraser considers those explanations "*ex post facto* justifications when in reality the decision was motivated by the [Appeal Committee members'] personal animus" towards him.[66]

Fraser then appealed the decision of the Appeal Committee, this time to the Dean of the Graduate School, Dr. Regina Vasilatos-Younken.[67] Shortly thereafter, the Dean issued a decision affirming the Appeal Committee "without substantial comment."[68]

## F.     Procedural History

In May 2022, Fraser initiated the instant action with a sixteen-count Complaint, naming Penn State, Dr. Paulson, Dr. Rolls, Dr. Read, Keystone Nano, and Dr. Mark Kester (the owner of Keystone Nano) as defendants.[69] The Complaint raised constitutional claims (alleging violations of the First Amendment free speech rights and Fourteenth Amendment rights concerning substantive and procedural due process), three counts asserting violations of the Fair Labor

---

[65]   *Id*. ¶¶ 213, 215.

[66]   *Id*. ¶ 212.

[67]   *Id*. ¶ 218.

[68]   *Id*. ¶ 219. Although Fraser makes no factual allegations about Dr. Vasilatos-Younken, he asserts, based on "information and belief," that she "was not an impartial decision maker" because she "had a self-interest to ensure the Program that is part of her Graduate School did not have a scandal involving a Committee member of a Program using public funds to advance personal interests"—a fact that "would tarnish [her] image and reputation." *Id*. ¶ 220. There is no indication, however, that Dr. Vasilatos-Younken was even aware of the complaints Fraser filed against Dr. Paulson in early 2019—approximately two years before Dr. Vasilatos-Younken affirmed Fraser's dismissal from his doctoral program.

[69]   *See* Doc. 1 (Compl.).

Standards Act ("FLSA"), and various state law claims.[70] The Defendants moved to dismiss the Complaint in full,[71] and the Court granted those motions, holding that Fraser failed to allege violations of either the Constitution or the FLSA, and then declined to exert supplemental jurisdiction over the state law claims.[72]

That dismissal, however, was without prejudice.[73] Accordingly, Fraser filed his Amended Complaint on February 21, 2023.[74] Although the Amended Complaint contains many new allegations—indeed, it is nearly twice the length of the original—the claims and Defendants are substantially the same.[75]

The Defendants now move to dismiss the Amended Complaint.[76] Those motions have been fully briefed and are now ripe for disposition.[77]

---

[70]   *Id*.

[71]   *See* Doc. 12 (Penn State Mot. to Dismiss Initial Compl.); Doc. 26 (Keystone Nano Mot. to Dismiss Initial Compl.). Please note: the motions to dismiss filed by Penn State were jointly filed with the University faculty members named as defendants—Dr. Paulson, Dr. Rolls, and Dr. Read. For the sake of simplicity, however, throughout this Memorandum Opinion, the Court refers to those motions as Penn State's.

[72]   Doc. 31 (Mem. Op.); Doc. 32 (Order).

[73]   *Id*.

[74]   Doc. 33 (Am. Compl.).

[75]   Fraser removed Dr. Kester as a defendant, consolidated his three FLSA claims into a single count, and removed certain state law claims. *Compare* Doc. 1 (Compl.), *with* Doc. 33 (Am. Compl.).

[76]   Doc. 34 (Keystone Nano Mot. to Dismiss Am. Compl.); Doc. 35 (Penn State Mot. to Dismiss Am. Compl.).

[77]   Keystone Nano Motion to Dismiss: Doc. 40 (Keystone Nano Br.); Doc. 41 (Fraser Opp. to Keystone Nano Mot. to Dismiss); Doc. 48 (Keystone Nano Reply). Penn State Motion to Dismiss: Doc. 42 (Penn State Br.); Doc. 49 (Fraser Opp. to Penn State Mot. to Dismiss); Doc. 50 (Penn State Reply).

## II.    LAW

Under Federal Rule of Civil Procedure 12(b)(6), the Court dismisses a complaint, in whole or in part, if the plaintiff fails to "state a claim upon which relief can be granted." Following *Bell Atlantic Corp. v. Twombly*[78] and *Ashcroft v. Iqbal*,[79] "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"[80] In deciding a motion to dismiss, courts within the United States Court of Appeals for the Third Circuit must follow three steps: (1) take note of the elements the plaintiff must plead to state a claim; (2) identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth; and (3) assume the veracity of all well-pleaded factual allegations and determine whether they plausibly give rise to an entitlement to relief.[81]

## III.   ANALYSIS

As with the claims in Fraser's original Complaint, the claims the Amended Complaint fall into three categories: (a) violations of rights secured by the United States Constitution; (b) violations of the FLSA; and (c) violations of Pennsylvania state law. And, again, the Court starts with the first two categories—that is, the federal causes of action. For the reasons detailed below, the Court finds that

---

[78]   550 U.S. 544 (2007).
[79]   556 U.S. 662 (2009).
[80]   *Id.* at 678 (quoting *Twombly*, 550 U.S. at 570).
[81]   *Connelly v. Lane Construction Corp.*, 809 F.3d 780, 787 (3d Cir. 2016) (internal quotations and citations omitted).

although the Amended Complaint addresses some of the deficiencies that necessitated dismissal of the federal claims in the initial Complaint, the bulk of this Court's concerns remain. Accordingly, the Amended Complaint, like its predecessor, fails to state a viable federal cause of action. The constitutional and FLSA claims in the Amended Complaint are therefore dismissed, which again obviates any need to address Fraser's state law claims.

### A.   Constitutional Claims

In its motion to dismiss Fraser's constitutional claims, Penn State presents three arguments. First, Penn State contests the claims on substantive grounds, asserting that the Amended Complaint—like the Complaint before it—lacks the factual allegations necessary to sustain the constitutional claims presented. Second, Penn State argues that the constitutional claims against the University faculty members (i.e., Dr. Paulson, Dr. Rolls, and Dr. Read) should be dismissed because the professors are qualifiedly immune. And third, Penn State asserts that Fraser fails to establish *Monell* liability as to the University. The Court addresses each argument in turn.

### 1.   Substantive Arguments

Over four counts, Fraser alleges that Penn State and the members of his Dissertation Committee violated three separate constitutional rights: (a) First Amendment right to freedom of speech; (b) Fourteenth Amendment right to substantive due process; and (c) Fourteenth Amendment right to procedural due

18

process. But as with the prior iterations of these claims, Fraser fails on all three fronts.

### a.      First Amendment

Penn State first moves to dismiss Count I, Fraser's claim that the University and Dr. Paulson violated his First Amendment rights by retaliating against him for filing complaints against Dr. Paulson for allegedly "misusing public funds, resources, and facilities."[82] To establish a Section 1983 First Amendment retaliation claim, a plaintiff must show that he participated in activity protected by the First Amendment and that the defendant retaliated against him in a manner that would be sufficient to deter a person of ordinary firmness from exercising his constitutional rights.[83] But Fraser has again failed to allege a viable First Amendment claim. Although the Amended Complaint successfully reframes the speech at issue to bring it within the ambit of the First Amendment, the factual issues concerning causation and retaliation remain.

### i.      Protected Speech

In assessing whether the First Amendment protects a public employee's speech, the Court must first "determine whether the employee is speaking upon matters of public concern."[84] If the employee's speech relates only to his "personal

---

[82]   Doc. 33 (Am. Compl.) ¶ 77.
[83]   *See Thomas v. Independence Township*, 463 F.3d 285, 296 (3d Cir. 2006).
[84]   *Borden v. School District of the Township of East Brunswick*, 523 F.3d 153, 168 (3d Cir. 2008) (citing *Connick v. Meyers*, 461 U.S. 138, 146 (1983)).

interest," it is not protected by the First Amendment.[85] The Supreme Court of the United States instructs that "[w]hether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record."[86] To qualify as "speech on a matter of public concern," the content must "generally address[] a social or political concern of the community."[87] And even if the content concerns "something that may impact the public," the speech may nevertheless fall outside the parameters of the First Amendment based on the "manner and context in which that statement was made."[88] When the "overall thrust" of a statement concerns a purely "private grievance[]," the inclusion of "collateral" comments that "touch[] upon a matter of public concern" does not "tip the First Amendment balance."[89]

In the initial Complaint, Fraser alleged that shortly after he started working in Dr. Paulson's lab at Penn State, "Dr. Paulson began tasking [him] with additional responsibilities that were beyond the scope of his fellowships and thesis

---

85   *Id.* (explaining that "government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment") (quoting *Connick*, 461 U.S. at 146).

86   *Connick*, 461 U.S. at 147–48.

87   *Borden*, 523 F.3d at 170.

88   *Miller v. Clinton County*, 544 F.3d 542, 550 (3d Cir. 2008).

89   *Id.* at 550–51; *see also Gorum v. Sessoms*, 561 F.3d 179, 187 (3d Cir. 2009) (holding that a university professor's "speech" during the disciplinary hearing for a particular student "did not involve a matter of public concern" because it simply "related to the personal grievance of one student" and, even "assuming that [the professor] raised matters of public concern in assisting [the student]," the context of the statements at issue obviate any First Amendment protection: the speech at issue occurred during the student's disciplinary hearing; "[t]here was no evidence in the record that [the professor] even made a public statement").

duties."[90] Fraser noted that he was "not paid" or "given academic credit" for the additional work.[91] According to Fraser, he was "concerned that [the additional duties] represented an impermissible conflict of interest between his advisor and the University," as they "constituted a diversion of Penn State resources and his own labor to Dr. Paulson's personal benefit," and, as such, he "felt he had a moral obligation to bring his concerns to the attention of Penn State."[92]

In the February 2023 Memorandum Opinion, this Court found that Fraser failed to plead facts demonstrating that his speech was protected by the First Amendment, explaining that Fraser's allegations were "limited to his own one-on-one relationship with his thesis advisor"; his speech did not "relate to a broad social or policy issue at [Penn State]" or constitute a "breach[] [of] the public trust in a manner that would meaningfully affect the greater [Penn State] community."[93]

Following that ruling, Fraser filed his Amended Complaint in which he recasts the nature of his concerns and complaints about Dr. Paulson. Fraser now asserts that his concern about the "additional duties" related to the purported "diversion of Penn State's taxpayer resources, his federal taxpayer fellowship monies to the personal benefit of Penn State, Dr. Paulson, and Keystone Nano."[94] The issue is no longer a possible conflict of interest between Dr. Paulson and Penn

---

90  Doc. 1 (Compl.) ¶ 23.
91  *Id*. ¶ 25.
92  *Id*. ¶¶ 27–28.
93  Doc. 31 (Mem. Op.) at 14–15 (citation and internal quotation marks and brackets omitted).
94  Doc. 33 (Am. Compl.) ¶ 68.

State, with Dr. Paulson benefiting from the uncompensated work of Penn State graduate students to the detriment of both Penn State and the students; instead, Fraser characterizes the alleged impropriety as a conspiracy between Dr. Paulson, Keystone Nano, and Penn State, with all three—including Penn State—benefiting at the taxpayer's expense.[95]  Gone is the "moral obligation" Fraser felt to protect the University, himself, and his fellow graduate students, replaced with the "civic obligation" to take action, "not for himself, but on behalf of the public and for the public's benefit."[96]

The Court finds it difficult to reconcile these seemingly contradictory pleadings.[97] At this stage, however, that is of no moment: because an "amended

---

[95] *Compare* Doc. 1 (Compl.) ¶ 27 ("Mr. Fraser further believed these additional duties constituted a diversion of Penn State resources and his own labor to Dr. Paulson's personal benefit and was concerned that they represented an impermissible conflict of interest between his advisor and the University."), *with* Doc. 33 (Am. Compl.) ¶ 64 ("Mr. Fraser further believed that these additional duties constituted a diversion of Penn State's taxpayer resources, his federal taxpayer fellowship monies to the personal benefit of Penn State, Dr. Paulson, and Keystone Nano.").

[96] Doc. 33 (Am. Compl.) ¶ 69.

[97] Although there are, at present, no legal consequences associated with Fraser's newfangled description of his complaints, the Court finds the operative pleadings highly suspect. As Penn State notes, Fraser's recast explanation for his grievances with Dr. Paulson do not necessarily accord with the remainder of the allegations in the Amended Complaint. *See* Doc. 42 (Penn State Br.) at 13–14.

For example, when describing his "turbulent prior relationship" with Dr. Paulson, Doc. 33 (Am. Compl.) at 7 (capitalization from heading removed), Fraser expresses his frustration not only with the work he allegedly performed for Keystone Nano that was outside the scope of his "education Program, stipend duties, and fellowship duties," but also with the work he did "to assist in other students' thesis projects in Dr. Paulson's lab" for which he "was given no credit"—work that seemingly had no relation to Keystone Nano. *Id.* ¶¶ 26–27, 30, 33 46, 55. Moreover, Fraser's complaints about "the work [he] performed for Penn State and Keystone Nano's benefit" center on how that work "detracted . . . from and interfered with [his] education Program and thesis"—not the alleged "diversion of Penn State's taxpayer resources" that fueled his sense of "civic obligation." *Id.* ¶¶ 43, 68–69, 350, 392. When Fraser decided to "take action . . . on behalf of the public and for the public's benefit" by "bring[ing]

22

complaint supersedes the original and renders it of no legal effect," all this Court

has before it are the allegations in the Amended Complaint. [98] And based on those

allegations, the Court is compelled to conclude that the speech at issue—the

"official reports" Fraser filed "with the appropriate offices at Penn State"

concerning Dr. Paulson's misuse of federal and state taxpayer resources, facilities,

and student's research for the benefit of Dr. Paulson and Keystone Nano"[99]—

pertained to "matters of public concern."[100]

### ii.    Retaliatory Acts

Once a plaintiff establishes that he was speaking out on a matter of public

concern, he "must then show that the protected activated was a substantial or

motivating factor in the alleged retaliatory action,"[101] and that "the alleged

---

his concerns to the attention of Penn State," he did so "in a discreet manner within the Department" by reporting the issue to Dr. Rolls and Dr. Read—he declined to issue a public statement about his concerns "because," he says, "it was a matter of public concern." *Id*. ¶¶ 69–70. And after Dr. Rolls and Dr. Read "indicated they were unwilling or unable to take appropriate action" on Fraser's reports of "taxpayer monies being misused," Fraser took no further steps to report the issue for two years. *Id*. ¶¶ 72–73. And when Fraser finally elected to file a formal complaint with Penn State, he did so simply to avoid "start[ing] his thesis over" with a new advisor. *Id*. ¶ 74.

Those allegations strongly suggest that Fraser's initial account of events more accurately reflects reality. That is troubling not simply because honesty and forthrightness are virtues upon which the American legal system relies, but because the competing accounts of Fraser's actions would receive different legal treatment per the Third Circuit's precedents. *See, e.g.*, *Gorum*, 561 F.3d at 187.

[98] *West Run Student Housing Associates, LLC v. Huntington National Bank*, 712 F.3d 165, 171 (3d Cir. 2013) (internal quotation marks and citation omitted).

[99] Doc. 33 (Am. Compl.) ¶¶ 71–75.

[100] *Borden*, 523 F.3d at 168; *see also Lane v. Franks*, 573 U.S. 228, 241 (2014) ("The content of [the plaintiff's] testimony—corruption in a public program and misuse of state funds—obviously involves a matter of significant public concern.").

[101] *Brennan v. Norton*, 350 F.3d 399, 419 (3d Cir. 2003) (internal quotation marks and citation).

retaliatory conduct was sufficient to deter a person of ordinary firmness from exercising his First Amendment rights."[102] Relevant here, when a plaintiff alleges "a campaign in retaliatory harassment," the Court must consider the cumulative effect of the alleged retaliatory conduct: "an entire campaign of harassment which though trivial in detail may have been substantial in gross."[103] That said, before accepting a plaintiff's call to aggregate discrete acts of alleged retaliation, the Court must determine whether each act was, in fact, causally connected to the plaintiff's protected speech.[104]

Here, Fraser predicates his Section 1983 First Amendment retaliation claim on the following allegedly retaliatory acts:

- Dr. Paulson informed Fraser in writing "that he intended to withhold [Fraser's] stipend unless he agreed to follow Dr. Paulson's every direction," effectively forcing Fraser "to engage in yet further uncompensated work outside of the Program and for the benefit of the Penn State-Keystone Nano-Dr. Paulson commercial relationship."[105]

- Dr. Paulson "spread accusations amongst the Department that [Fraser] had failed to credit him on a conference presentation when this accusation was patently untrue."[106]

- Dr. Paulson "locked [Fraser] out of the lab" on several occasions, "thereby denying him access to Departmental resources that are part

---

[102] *McKee v. Hart*, 436 F.3d 165, 170 (3d Cir. 2006) (internal quotation marks and citation omitted).

[103] *Suppan v. Dadonna*, 203 F.3d 228, 234–35 (3d Cir. 2000) (internal quotation marks and citation omitted).

[104] *See Brennan*, 350 F.3d at 419–24 (individually "examin[ing] the allegations of retaliatory conduct by each of the defendants" to determine whether "the alleged retaliatory conduct was the result of [the plaintiff's] protected speech").

[105] Doc. 33 (Am. Compl.) ¶ 79.

[106] *Id*. ¶ 82.

> of the Program, such as the copier/scanner, and precious time to continue work on experiments for his doctoral research."[107]

- Dr. Rolls "demanded that [Fraser] turn over confidential data regarding his research."[108]

- Dr. Paulson and Dr. Rolls, one week before the schedule date of Fraser's thesis defense, "rais[ed] last minute concerns regarding [Fraser's] thesis document."[109]

- The Dissertation Committee "cancelled" Fraser's first thesis defense "just two days before the scheduled [date]," instructing him "to go home to Boston over winter break, write a new version of his thesis document, and defend it in the first week of January before the official start to the spring 2020 semester."[110]

- Dr. Paulson and Dr. Rolls "resumed claiming [Fraser's] thesis document was insufficiently 'polished' to proceed to defense."[111]

- The Dissertation Committee gave Fraser two opportunities to defend his thesis—in January and July of 2020, respectively—and "failed" Fraser both times, resulting in Fraser's dismissal from the Program.[112]

These alleged actions of retaliation, however, lack either an articulated factual nexus to Fraser's protected speech or the requisite temporal proximity to establish causation.

For Dr. Paulson's May 2019 "threat" to withhold Fraser's stipend, the allegations do not demonstrate a retaliatory purpose. According to Fraser, the laboratory work was unrelated to his thesis, which he performed "on behalf of

---

[107] *Id*. ¶ 84.
[108] *Id*. ¶ 86.
[109] *Id*. ¶ 114.
[110] *Id*. ¶¶ 118–19.
[111] *Id*. ¶ 121.
[112] *Id*. ¶¶ 128, 191–92.

Penn State and Keystone Nano" at Dr. Paulson's direction, was "an implicit requirement of obtaining his Ph.D."[113] But in 2019, Fraser "started to push back and stopped agreeing to assist" on those additional assignments.[114] The alleged threat from Dr. Paulson, as Fraser frames it, concerned Fraser's continued work on the additional assignments—not Fraser's official reports to the appropriate Penn State officials.[115] Simply demanding that a doctoral candidate continue with the tasks he was always expected to perform does not constitute retaliation.

For the allegation that Dr. Paulson spread false accusations about Fraser failing to credit him on a conference presentation, Fraser provides no information on when Dr. Paulson purportedly made this false accusation. That is significant, as an inference of retaliatory animus premised on temporal proximity is highly fact-dependent—the plaintiff must show that the protected speech and alleged retaliation were, in fact, sufficiently close in time.[116] Moreover, even if Fraser had alleged a sufficient temporal proximity between his protected speech and Dr. Paulson's false accusations, it would be of no consequence. As the Third Circuit instructs, courts typically "decline[] to find that an employer's actions have adversely affected an employee's exercise of his First Amendment rights where the

---

[113] *Id.* ¶ 224.

[114] *Id.* ¶ 39.

[115] *Id.* ¶ 79.

[116] *See, e.g., Brennan*, 350 F.3d at 420, 423–24 ("Although the nine-month gap here between expression and alleged retaliation is not, by itself, sufficient to preclude an inference of causation, . . . [a] twenty-one-month time lapse between [the] protected activities and [the false charge] is too remote to support an inference of retaliation.").

employer's alleged retaliatory acts were criticism, false accusations, or verbal reprimands."[117]

Fraser's arguments about Dr. Paulson locking him out of the lab and Dr. Rolls demanding that he turn over confidential data suffer from many of the same defects as the prior two alleged retaliatory actions. Fraser does not allege when either action supposedly occurred, making it impossible for this Court to draw any inference based on temporal proximity.[118] And the allegations Fraser does make provide no other basis for a causal nexus with Fraser's protected speech. For the restrictions on accessing the lab, the only factual allegations potentially related to this topic signal that "Fraser was barred from being in the lab at the same time as [a fellow student who accused him of Title IX accusations]."[119] For the confidential data, Fraser says only that Dr. Rolls demanded the data "despite having no legal or contractual authority to do so"; that pleading says nothing about why Dr. Rolls supposedly wanted the data or how that demand pertained to Fraser's complaints against Dr. Paulson.[120]

The only other alleged retaliatory actions concern Fraser's attempts to defend his thesis.[121] The earliest of those actions occurred in November 2019—

---

[117] *McKee*, 436 F.3d at 170.
[118] *See* Doc. 33 (Am. Compl.) ¶¶ 84, 86.
[119] Doc. 33 (Am. Compl.) ¶ 90.
[120] *Id.* ¶ 86.
[121] *See id.* ¶¶ 114, 119, 121, 128, 191–92.

seven months after Fraser filed the "official reports" against Dr. Paulson.[122] Although that gap in time "is not, by itself, sufficient to preclude an inference of causation," it also does not suggest a causal link.[123]

Moreover, there is nothing other than Fraser's claim of causation to connect his complaints about Dr. Paulson and his failed attempts to defend his thesis.[124] Fraser details the Doctoral Committee's proffered bases for its decision to fail him and then explains why he disagrees.[125] But simply disagreeing with the Doctoral Committee's criticisms of his thesis and defense is not evidence of retaliatory malice.

Further, as Fraser explains, he was provided the opportunity to contest the Doctoral Committee's decision. That decision was ratified first by an Appeal Committee (which, to be fair, included members of his Dissertation Committee) and then again by the Dean of the Graduate School.[126] Far from validating Fraser's allegations of retaliation, the affirmance on appeal (particularly the decision by the Graduate School Dean, a Penn State administrator who had no involvement in Fraser's two attempts to defend his thesis) suggests that the Doctoral Committee's decisions were well founded. Even when considering those facts in the light most

---

[122] *See id.* ¶¶ 71–75, 114.

[123] *Brennan*, 350 F.3d at 420.

[124] *See id.* ("Although the nine-month gap here between expression and alleged retaliation is not, by itself, sufficient to preclude an inference of causation, there is nothing other than [the plaintiff's] claim of causation to connect the two.").

[125] *See* Doc. 33 (Am. Compl.) ¶¶ 125–130, 197–99.

[126] *See id.* ¶¶ 202–10, 218–19.

favorable to Fraser (as this Court must at this stage of the proceedings), the Court finds no basis for concluding that Fraser's dismissal from the doctoral program constituted unlawful retaliation.

Lacking an inference based on temporal proximity or any factual allegations directly indicating a retaliatory motive, Fraser has not alleged a causal nexus between his protected speech and the actions at issue. Accordingly, the Court finds that Fraser again fails to present a viable Section 1983 First Amendment retaliation claim. Count I is dismissed.[127]

### b.   Substantive Due Process

In Count II, Fraser alleges that Penn State as well as the members of his Dissertation Committee (i.e., Dr. Paulson, Dr. Rolls, and Dr. Read) violated his constitutionally protected substantive due process rights when they dismissed him from the doctoral program.[128] But to sustain a Section 1983 substantive due process claim, a plaintiff must establish (1) he has a protected property interest to which the Fourteenth Amendment's substantive due process protection applies,[129]

---

[127] The Court premised its initial dismissal of Fraser's First Amendment claim on Fraser's "inability to demonstrate the protected nature of his speech." Doc. 31 (Mem. Op.) at 15 n.75. That said, the Court explicated its concerns about causation as well, explaining that Fraser "cannot show that his complaint about [Dr. Paulson] was a substantial factor behind the University and the Professors' decision to dismiss him from the Program," and that the Court finds Penn State's "argument regarding temporal proximity persuasive." *Id.* Fraser was therefore on notice that the allegations in the initial Complaint were insufficient to establish causation. The Court gave Fraser the opportunity to remedy those deficiencies, but he failed to do so. Accordingly, the Court finds that further amendment of this claim would be futile. It is therefore dismissed with prejudice.

[128] *See* Doc. 33 (Am. Compl.) ¶¶ 248–65.

[129] *Nicholas v. Pennsylvania State University*, 227 F.3d 133, 142 (3d Cir. 2000).

and (2) a state actor deprived him of that property interest "through an arbitrary and deliberate abuse of authority."[130] Fraser has established neither.

First, the Third Circuit explains that "when a plaintiff challenges a non-legislative state action (such as an adverse employment decision), [courts] must look, as a threshold matter, to whether the property interest being deprived is 'fundamental' under the Constitution."[131] If the interest is not "fundamental," the governmental action "is entirely outside the ambit of substantive due process and will be upheld so long as the state satisfies the requirements of procedural due process."[132]

In accordance with the Supreme Court's admonition that courts should exercise "utmost care whenever asked to break new ground in this field,"[133] the Third Circuit has "been reluctant to extend substantive due process protection to other, less fundamental property interests."[134] Accordingly, the Third Circuit "has strongly suggested that the right to continued graduate education is not protected by substantive due process."[135]

---

[130] *Elansari v. United States*, 823 F. App'x 107, 112 (3d Cir. 2020) (citing *Independent Enterprises Inc. v. Pittsburgh Water and Sewer Authority*, 103 F.3d 1165, 1179–80 (3d Cir. 1997)).

[131] *Nicholas*, 227 F.3d at 142.

[132] *Id.*

[133] *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992).

[134] *Nicholas*, 227 F.3d at 141.

[135] *Manning v. Temple University*, 157 F. App'x 509, 514 (3d Cir. 2005); *see also Mauriello v. University of Medicine and Dentistry of New Jersey*, 781 F.2d 46, 50 (3d Cir. 1986) (favorably citing Justice Powell's concurrence in *Regents of the University of Michigan v. Ewing*, 474 U.S. 214 (1978), which found that a graduate student's claim to a protected property right in

Against that legal backdrop, this Court finds that Ph.D. candidates like Fraser do not possess a constitutionally protected property interest in their continued enrollment in their respective doctoral programs. Accordingly, Penn State's decision to dismiss Fraser falls "entirely outside the ambit of substantive due process."[136]

Second, even if the Court accepted Fraser's position that his continued enrollment in a doctoral program is a fundamental right, he has not shown that Penn State's decision to dismiss him constituted an "arbitrary and deliberate abuse of authority."[137] As the Supreme Court held in *Regents of University of Michigan v. Ewing*, "[w]hen judges are asked to review the substance of a genuinely academic decision," they "should show great respect for the faculty's professional judgment"; courts "may not override [the faculty's decision] unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment."[138]

Applying that instruction, this Court in February 2023 dismissed the prior iteration of Fraser's substantive due process claim because "Fraser's allegations, even when viewed in the light most favorable to him, demonstrate that a state

---

his continued enrollment "is dubious at best," as it bore "little resemblance to the fundamental interests that previously had been viewed as implicitly protected by the Constitution").

[136] *Nicholas*, 227 F.3d at 142.

[137] *Elansari*, 823 F. App'x at 112.

[138] 474 U.S. at 225.

university decided to dismiss a graduate student after a panel consisting of multiple educated professors found the student's thesis presentation decision deficient on two separate occasions."[139] The Court explained that those allegations "do not go 'beyond the pale of reasoned academic decision-making' or demonstrate a conscience-shocking 'departure from academic norms.'"[140] Although Fraser's Amended Complaint supplements the initial pleadings with a significant number of additional allegations, Fraser presents no new details concerning his failed attempts to defend his thesis, the Doctoral Committee's decision to dismiss him from the Program, or his failed attempts to appeal the dismissal—at least, nothing that materially alters the core factual circumstances surrounding his dismissal.[141]

Accordingly, the Court again finds that Fraser fails to plead facts demonstrating that Penn State and the members of his Dissertation Committee deprived him of a fundamental right through an arbitrary and deliberate abuse of authority. Count II is therefore dismissed with prejudice.

### c.    Procedural Due Process

For his final constitutional claims (Counts III and IV), Fraser asserts that his procedural due process rights were violated when the Dissertation Committee

---

[139]  Doc. 31 (Mem. Op.) at 19.
[140]  *Id*. (citations omitted).
[141]  Doc. 33 (Am. Compl.) ¶¶ 103–222.

dismissed him from the doctoral program and also during the appeals process.[142] But this Court dismissed identical claims premised on identical pleadings in February 2023.[143] The reasoning underpinning that ruling applies with equal force here.

Procedural due process requires "that a deprivation of life, liberty, or property be preceded by notice and opportunity for hearing appropriate to the nature of the case."[144] Recognizing that "[a] school is an academic institution, not a courtroom or administrative hearing room," the Supreme Court has "stopped short" of finding that the Constitution's guarantee of procedural due process necessitates "a formal hearing" prior to a student's suspension or dismissal from an academic program.[145] Instead, "more informal forms of notice and hearings suffice."[146]

Specifically, "[b]efore a public university dismisses a student for disciplinary reasons, the Due Process Clause requires that it afford 'rudimentary precautions against unfair or mistaken findings of misconduct and arbitrary exclusion.'"[147] And if the dismissal is for purely academic reasons, "it faces an

---

[142] *See* Doc. 33 (Am. Compl.) ¶¶ 266–79 (Count III: procedural due process claim based on dismissal from the Program), 280–94 (Count IV: procedural due process claim based on the appeals process).

[143] *See* Doc. 31 (Mem. Op.) at 20–25.

[144] *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 542 (1985) (internal quotation marks and citation omitted).

[145] *Board of Curators of University of Missouri v. Horowitz*, 435 U.S. 78, 87–89 (1978).

[146] *Keles v. Bender*, No. 21-1497, 2022 WL 840311, at *3 (3d Cir. 2022) (citing *Horowitz*, 435 U.S. at 89–90).

[147] *Id*. (quoting *Gross v. Lopez*, 419 U.S. 565, 581 (1975)).

even lower hurdle; it need only provide 'an informal-give-and-take between the student and the administrative body' responsible for the dismissal."[148]

Here, the Dissertation Committee's decision to dismiss Fraser from his doctoral program was "academic" in nature—not disciplinary. As detailed in the Amended Complaint, Fraser was dismissed from the program because his thesis defense did not pass muster.[149] According to Fraser, when the Dissertation Committee explained its "reasoning for failing him," the "only specific criticism leveled was that 'throughout the oral defense, [Fraser] made conclusions that extended far beyond the data presented."[150] And when the  Appeal Committee denied Fraser's appeal and affirmed his dismissal, it explained that Fraser's appeal "did not address the primary cause for his failure during the oral defense" (i.e., making conclusions that extended beyond the data) and that Fraser "was unwilling to take feedback from the [Dissertation Committee] and incorporate it adequately into his dissertation."[151] Those allegations demonstrate that Fraser was dismissed not for an act of academic dishonesty such as plagiarism—which this Court has

---

[148] *Id.* (citing *Mauriello*, 781 F.2d at 50).
[149] *See* Doc. 33 (Am. Compl.) ¶¶ 186–92 (explaining that after his second thesis defense, he was "ejected from the Program without the Ph.D." because his Dissertation Committee "failed him a second time"), 194–95 (expressing frustration "for being failed on grounds of the oral defense alone").
[150] *Id.* ¶¶ 197–99.
[151] *Id.* ¶¶ 213, 215.

held constitutes a "disciplinary" dismissal[152]—but, rather, because his Dissertation Committee deemed his thesis inadequate, undeserving of a Ph.D.[153]

And under the more permissive standard of review for purely academic actions, the Court finds that Penn State afforded Fraser the process he was due. As Fraser alleges, he was given two separate opportunities to defend his thesis. Prior to his first defense, his Dissertation Committee gave Fraser instruction on what work he needed to perform "to successfully defend his thesis and be awarded his Ph.D."[154] Indeed, concerned that Fraser's thesis would not pass muster, the Dissertation Committee postponed his defense, affording Fraser several additional weeks to clean up his thesis and make the required revisions.[155] And after Fraser failed despite this direction, the Dissertation Committee outlined their concerns in

---

[152] *See Valentine v. Lock Haven University of Pennsylvania*, 2014 WL 350857, at *6–7 (M.D. Pa. July 14, 2014).

[153] To be clear, Fraser also asserts, based "[u]pon information and belief," that "the decision to dismiss [him] was based in substantial part upon unsubstantiated accusations by Dr. Paulson that [Fraser] had fabricated data." Doc. 33 (Am. Compl.) ¶ 271. That allegation, however, does not accord with the Dissertation Committee's stated rationale for failing Fraser, which Fraser quotes directly in his Amended Complaint. *See id*. ¶ 198. Further, by Fraser's own admission, the Dissertation Committee never said anything about Fraser fabricating data—either before or after his second thesis defense. *See id*. ¶¶ 198, (describing the Dissertation Committee's conclusion that Fraser "made conclusions that extended far beyond the data presented" as "[t]he only specific criticism leveled"), 272 ("At no point did the [Dissertation Committee] inform [him] that he had fabricated data in any of the thesis drafts that he submitted prior to his second defense."). Perhaps Fraser is simply interpreting the Dissertation Committee's rather straightforward finding that he overstated his data as an accusation of data fabrication. It's hard to say. Regardless, at this stage, the Court need not credit such conclusory allegations—particularly when they are inconsistent with the Amended Complaint's factual averments that are entitled to a presumption to truth. *See Iqbal*, 556 U.S. at 681 (holding that "the allegations are conclusory and not entitled to be assumed true").

[154] Doc. 33 (Am. Compl.) ¶ 109.

[155] *Id*. ¶¶ 118–19.

writing and then provided Fraser further feedback in the weeks and months before his second defense.[156] By any measure, the extended back-and-forth between Fraser and the members of his Dissertation Committee—which occurred over the course of a full academic year—constitutes the type of informal "give-and-take between the student and the administrative body responsible for the dismissal" that courts require.[157]

Moreover, after the Dissertation Committee dismissed Fraser from his doctoral program, Penn State granted Fraser the opportunity to appeal his dismissal.[158] And Fraser did, in fact, appeal.[159] Although the first appellate body (i.e., the Appeal Committee) included among its members the professors on Fraser's Dissertation Committee, Fraser's second appeal went to the Dean of the Graduate School, an unbiased administrator who was not involved in either of Fraser's failed defenses.[160]

Taken together, the year-long back-and-forth between Fraser and his Dissertation Committee preceding his dismissal and the multi-level appeal process culminating in a final review by an unbiased decisionmaker comfortably clears the "low[] hurdle" courts have established for procedural due process challenges to

---

[156] *Id*. ¶¶ 138–41, 152–57.

[157] *Keles*, 2022 WL 840311, at *3 (citing *Horowitz*, 435 U.S. at 89–90) (internal quotation marks omitted).

[158] Doc. 33 (Am. Compl.) ¶¶ 200–22.

[159] *Id*. ¶ 200.

[160] *Id*. ¶¶ 202, 218.

student dismissals based on academic reasons.[161] As such, Counts III and IV of the Amended Complaint are dismissed. Because the Court's ruling here aligns with its February 2023 dismissal of the procedural due process claims presented in Fraser's initial Complaint—unaffected by any supplemental pleadings included in the Amended Complaint—further amendment would be futile. The dismissal is therefore with prejudice.

### 2. Qualified Immunity

Separately, the individual Penn State faculty members named as defendants in this case—Dr. Paulson, Dr. Read, and Dr. Rolls—argue that the constitutional claims against them should be dismissed because they are entitled to qualified immunity.[162] The Court agrees.

Federal and state officials are immune from lawsuits pertaining to official conduct unless a plaintiff pleads facts showing the officials violated a statutory or constitutional right that was "clearly established" at the time of the challenged conduct.[163] The Supreme Court explains that a government official's conduct "violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have

---

[161] *Keles*, 2022 WL 840311, at *3 (citing *Horowitz*, 435 U.S. at 89–90) (internal quotation marks omitted). Indeed, even if the Court deemed Penn State's dismissal of Fraser to be "disciplinary" in nature, the process the University employed for considering Fraser's dissertation, dismissing him from the doctoral program, and affirming that dismissal would exceed the "rudimentary precautions against unfair or mistaken findings of misconduct and arbitrary exclusion" that public universities must adopt for disciplinary actions. *Id*.

[162] *See* Doc. 42 (Penn State Br.) at 12.

[163] *See Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011).

understood that what he is doing violates that right."[164] Such "clearly established rights are derived either from binding Supreme Court and Third Circuit precedent or from a robust consensus of cases of persuasive authority in the Courts of Appeals."[165] And "[u]nless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery."[166]

Here, Fraser does not dispute that Dr. Paulson, Dr. Reed, and Dr. Rolls, as Penn State employees, are "public officials for Section 1983 purposes."[167] Instead, Fraser opposes the professors' qualified immunity defense solely on the basis that "he has adequately pleaded that [they] did in fact violate Constitutional rights clearly established by existing case law."[168] But that's incorrect. As detailed above, the pleadings in the Amended Complaint do not support Fraser's constitutional claims: the allegations fail to establish that either Penn State or its faculty members violated Fraser's rights guaranteed by the First and Fourteenth Amendments.

Because Fraser has "identified neither Supreme Court precedent nor a robust consensus of cases of persuasive authority" demonstrating that Dr. Paulson, Dr.

---

[164] *Id.* at 741 (internal quotation marks, brackets, and citation omitted).

[165] *Bland v. City of Newark*, 900 F.3d 77, 84 (3d Cir. 2018) (internal quotation marks and citation omitted).

[166] *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1986)).

[167] Doc. 42 (Penn State Br.) at 12; *see also* Doc. 49 (Fraser Opp. to Penn State Mot. to Dismiss) at 17 ("Fraser therefore confines his arguments in response to those outlined [in his section concerning the substance of the constitutional claims].").

[168] Doc. 49 (Fraser Opp. to Penn State Mot. to Dismiss) at 17.

Reed, and Dr. Rolls violated clearly established law,[169] his Section 1983 claim

against the professors is dismissed on qualified immunity grounds as well.[170]

### 3.    *Monell* Liability

In its final argument in opposition to Fraser's constitutional claims, Penn

State asserts that "Fraser's claims against the University under Section 1983 must

be dismissed because he fails to state a claim under *Monell*," emphasizing that

"Fraser does not identify any University policy that caused the alleged retaliation

or his termination from the Program."[171] The Court, however, need not address that

argument. To establish municipal liability for a constitutional violation, there must

first be a constitutional violation.[172] And, as discussed, Fraser has failed to allege

that any member of the Penn State faculty violated his constitutional rights.

### B.    Fair Labor Standards Act

In Count XII of the Amended Complaint, Fraser reasserts his FLSA claims

against Keystone Nano and Penn State, arguing that both Defendants "failed to pay

[him] for all hours worked . . . outside the scope of his education Program, stipend

duties, and fellowship duties."[173] The Defendants have separately moved to dismiss

---

[169]  *Mirabella v. Villard*, 853 F.3d 641, 653 (3d Cir. 2017) (internal quotations marks and citation omitted) (holding that defendants were entitled to qualified immunity at the pleading stage).

[170]  *See also McKee*, 436 F.3d at 171 ("Because [the plaintiff] has not alleged the deprivation of a constitutional right, [the defendant] is entitled to qualified immunity.").

[171]  Doc. 42 (Penn State Br.) at 11.

[172]  *See Natale v. Camden County Correctional Facility*, 318 F.3d 575, 584 (3d Cir. 2003) (holding that to establish *Monell* liability, a plaintiff needs to show "that the policy caused the constitutional violation [he] allege[s]").

[173]  Doc. 33 (Am. Compl.) ¶ 415.

the FLSA claims, arguing that the FLSA protections do not apply to Fraser—at least not regarding the work he performed for Keystone Nano and Penn State, respectively.[174]

The FLSA established "baseline standards through federal minimum-wage, maximum-hour, and overtime guarantees that cannot be modified by contract."[175] That said, FLSA protections "do not extend to everyone."[176] The FLSA applies only to individuals "employed by an employer."[177] Put differently, to be covered, an individual worker must be an "employee."[178] And even then, the FLSA enumerates certain categories of employees to whom the title and its protections do not apply.[179]

For the reasons provided below, the Court finds that Fraser was not a covered employee of either Keystone Nano or Penn State.

### 1.    Keystone Nano

Fraser first asserts that he is entitled to damages from Keystone Nano under the FLSA because the company did not compensate him for work he performed on its behalf.[180] To be clear, Fraser does not allege that he ever entered a formal

---

[174] *See* Doc. 40 (Keystone Nano Br.) at 6–16; Doc. 42 (Penn State Br.) at 31–35.

[175] *Smiley v. E.I. Dupont De Nemours and Co.*, 839 F.3d 325, 329–30 (3d Cir. 2016) (internal quotation marks and citation omitted).

[176] *Clews v. County of Schuylkill*, 12 F.4th 353, 359 (3d Cir. 2021).

[177] 29 U.S.C. § 203(e)(1); *see also Razak v. Uber Technologies, Inc.*, 951 F.3d 137 (3d Cir. 2020) (analyzing whether Uber drivers qualify as "employees" under the FLSA or are instead properly categorized as independent contractors).

[178] *Id.*

[179] 29 U.S.C. § 213.

[180] Doc. 33 (Am. Compl.) ¶¶ 386–416.

contractual arrangement with Keystone Nano; there is no written employment contract or agreement, no promise of payment, no express commitment of any kind.[181] Instead, Fraser claims that because he performed laboratory work for Keystone Nano's benefit while pursuing his Ph.D. at Penn State, he should be considered a Keystone Nano employee—in substance, if not in form.[182] Keystone Nano disputes that, arguing that no employment relationship existed because no one at Keystone Nano "ever had any contact or control whatsoever over Fraser."[183] The Court agrees with Keystone Nano.

When assessing whether an employer-employee relationship exists under the FLSA, courts apply different legal standards based on the nature of the alleged employment relationship at issue. Here, the parties disagree on what standard should apply. Keystone Nano asks the Court to apply the six-part "economic realities" test adopted by the Third Circuit in *Donovan v. DialAmerica Marketing, Inc.*,[184] which is principally "intended to measure and balance the competing economic realities involved in an employee/independent contractor distinction."[185] Conversely, Fraser urges the Court to adopt the multi-factor test developed by the

---

[181] *See id.* ¶¶ 23–66.

[182] *See* Doc. 41 (Fraser Opp. to Keystone Nano Mot. to Dismiss) at 5–17.

[183] Doc. 48 (Keystone Nano Reply) at 1.

[184] *See* Doc. 40 (Keystone Nano Br.) at 8 (citing *Razak*, 951 F.3d at 142–43; *Donovan v. DialAmerica Marketing, Inc.*, 757 F.2d 1376, 1382 (3d Cir. 1985)).

[185] *Todaro v. Township of Union*, 27 F. Supp. 2d 517, 534 (D.N.J. 1998) (internal quotation marks and citation omitted).

United States Court of Appeals for the Second Circuit in *Glatt ex rel. situated v. Fox Searchlight Pictures, Inc.* to assess the employment status of unpaid interns.[186]

But neither standard fits the circumstances at issue here. Keystone Nano does not claim that it hired Fraser as an independent contractor, compensating him for specific tasks performed; it argues there was no employment relationship of any kind.[187] And Fraser does not assert that he was hired to work for Keystone Nano as an unpaid intern; indeed, the term "intern" does not appear in the Amended Complaint.[188] As this Court sees it, the role of Ph.D. candidate—fundamentally academic in nature, but with an opportunity for (and, in some cases, an expectation of) compensation from either the university or outside funding sources—is distinct from other, traditional professional arrangements, and, as such, it elides easy classification for purposes of an FLSA analysis.

That said, there are components of both the *Donovan* economic realities test and the *Glatt* test for unpaid interns that are relevant here. Specifically, when assessing a possible employment relationship between a doctoral candidate and an external commercial entity,[189] courts should consider the following factors: (1) the

---

[186] *See* Doc. 41 (Fraser Opp. to Keystone Nano Mot. to Dismiss) at 8 (citing *Glatt ex rel. situated v. Fox Searchlight Pictures, Inc.*, 811 F.3d 528 (2d Cir. 2015)).

[187] *See* Doc. 48 (Keystone Nano Reply) at 5 ("Fraser was a student at Penn State, and Fraser's work was directed by [Dr. Paulson], an employee of Penn State, as part of Fraser's doctoral program.").

[188] *See* Doc. 33 (Am. Compl.).

[189] By external, this Court means a commercial entity independent of the university with which the doctoral candidate is pursuing his or her Ph.D.

relationship between the work performed and the Ph.D. candidate's doctoral program; (2) the Ph.D. candidate's reasonable expectation of compensation; and (3) the level of control the company exerted over the Ph.D. candidate's work.[190] Here, all three factors support Keystone Nano's position that Fraser was not a Keystone Nano employee during his time as a Ph.D. candidate at Penn State.

First, to the extent Fraser performed work for the benefit of Keystone Nano, he did so as part of his doctoral program. Fraser was selected for the Keystone Nano-related work because of his placement in the Ph.D. program; absent his doctoral candidacy at Penn State, he would not have been eligible for the role.[191] Fraser conducted the relevant research and experiments at a Penn State laboratory, at the direction of Dr. Paulson, a Penn State professor.[192] And Fraser's continued placement in, and successful completion of, his doctoral program was allegedly contingent on, among other things, his work related to Keystone Nano.[193] Because

---

[190] *See Glatt*, 811 F.3d at 536–37 ("1. The extent to which the intern and the employer clearly understand that there is no expectation of compensation. Any promise of compensation, express or implied, suggests that the intern is an employee—and vice versa; . . . 3. The extent to which the internship is tied to the intern's formal education program . . . ."); *Donovan*, 757 F.2d at ("(1) the degree of the alleged employer's right to control the manner in which the work is to be performed . . . ."). The factors specified are non-exhaustive; this Court acknowledges that different circumstances may necessitate the assessment of additional considerations. *See Glatt*, 811 F.3d at 537 (noting that "the factors [specified] are non-exhaustive—courts may consider relevant evidence beyond the specified factors in appropriate cases").

[191] Indeed, after Fraser "stopped agreeing to assist on the Keystone Nano work[,] . . . another graduate student in Dr. Paulson's lab replaced [him] in the Keystone Nano role." Doc. 33 (Am. Compl.) ¶ 39.

[192] *See* Doc. 33 (Am. Compl.) ¶¶ 20 (describing "the facilities and lab materials Mr. Fraser used in Dr. Paulson's lab"), 30 (discussing "Keystone Nano drugs sent to Dr. Paulson's lab by Mark Kester's lab (owner of Keystone Nano)").

[193] *See, e.g., id.* ¶¶ 41 (asserting that if Fraser "did not complete the [Keystone Nano] work outside the scope of his education Program, . . . he would not have passed the Program"),

43

Fraser's work on behalf of Keystone Nano is inseparable from his doctoral candidacy, this factor militates against the finding of an employer-employee relationship.

Second, although Fraser alleges that he had "an expectation of compensation," the pleadings in the Amended Complaint fail to show that such an expectation was reasonable.[194] Fraser notes "Keystone Nano's historical practice" of "paying students for work conducted outside the scope of the education Program, stipend duties, and fellowship duties," but the Amended Complaint is devoid of any factual averments substantiating that claim.[195] To the extent the Amended Complaint references non-stipend and non-fellowship funding for Penn State graduate students, it provides that such funding was "customarily paid by Penn State."[196]

Moreover, as Keystone Nano argues, based on the pleadings in the Amended Complaint, it is unclear that Keystone Nano "knew the nature of Fraser's program, that the work he allegedly performed was outside of his program, or that anyone at Keystone Nano had any contact with Fraser at all."[197] Absent some indication that individuals at Keystone Nano were aware of the work Fraser was

---

335 ("[D]espite not being an explicit requirement of the Program, Mr. Fraser working for free (effectively as an indentured servant) was an implicit requirement of obtaining his Ph.D.").

[194] Doc. 41 (Fraser Opp. to Keystone Nano Mot. to Dismis) at 9.

[195] Doc. 33 (Am. Compl.) ¶ 47.

[196] *Id*. ¶ 334.

[197] Doc. 48 (Keystone Nano Reply) at 5.

performing on the company's behalf and communicated with Fraser about the nature and scope of that work, the Court cannot credit Fraser's claim that he reasonably expected Keystone Nano to compensate him. Accordingly, this factor likewise suggests that no employer-employee relationship existed between Keystone Nano and Fraser.

And third, the Amended Complaint does not establish that Keystone Nano had any control over the manner in which Fraser purportedly performed work on the company's behalf. In the February 2023 Memorandum Opinion dismissing the Keystone Nano FLSA claim in Fraser's initial Complaint, this Court held that Fraser "failed to plead any facts that Keystone Nano exerted any significant control over Fraser."[198] explaining that "[a]t most, . . . the Complaint [alleges] that Dr. Paulson was affiliated with Keystone Nano, and that the alleged extracurricular work Dr. Paulson required Fraser to complete somehow benefitted Keystone Nano," but that was "not enough to establish that Keystone Nano exercised any 'control' over Fraser."[199]

The additional allegations in the Amended Complaint fail to remedy the identified deficiencies. Indeed, when discussing this factor in his opposition brief, Fraser again emphasizes only that "he was directed to perform tasks by Dr. Paulson, on behalf of Keystone [Nano] and Penn State."[200] But as Keystone Nano

---

[198]   Doc. 31 (Mem. Op.) at 27
[199]   *Id*. (cleaned up).
[200]   Doc. 41 (Fraser Opp. to Keystone Nano's Mot. to Dismiss) at 10.

notes, the Amended Complaint contains no details on "how Dr. Paulson, a Penn State employee, was connected to Keystone Nano," or whether Dr. Paulson "ever took any direction from an employee of Keystone Nano related to Fraser's work."[201] Without such detail, Fraser cannot demonstrate that       Keystone Nano possessed the requisite right to control Fraser's work needed to show the existence of an employer-employee relationship.

Fraser has therefore failed to plead that he was an employee of Keystone Nano. And as such, his FLSA claim against the company cannot proceed.[202]

### 2.    Penn State

As it relates to Penn State, the question is whether a university's doctoral candidates—who are enrolled at the university and, as part of their doctoral

---

[201] Doc. 48 (Keystone Nano Reply) at 6–7 (cleaned up).

[202] Separately, Fraser argues that this Court should deem him a Keystone Nano employee under the "joint employer" framework the Third Circuit adopted in *In re Enterprise Rent-A-Car Wage & Hour Employment Practices Litig.*, 683 F.3d 462, 469 (3d Cir. 2012). *See* Doc. 41 (Fraser Opp. to Keystone Nano Mot. to Dismiss) at 15–17. That framework consists of four factors: "does the alleged employer have (1) authority to hire and fire employees; (2) authority to promulgate work rules and assignments, and set conditions of employment, including compensation, benefits, and hours; (3) day-to-day supervision, including employee discipline; and (4) control of employee records, including payroll, insurance, taxes, and the like." *In re Enterprise Rent-A-Car*, 683 F.3d at 469. As this Court sees it, all four factors fall under the broader parameters of an employer's "control" of a purported employee. Consistent with the Court's conclusion that Fraser fails to plead that Keystone Nano possessed the right to control his work on behalf of the company, the Court finds that the four "joint employment" factors weigh against Fraser: there is no indication that Keystone Nano had the authority to dictate which Penn State Ph.D. candidates worked on its research, the assignments and conditions of the work the Ph.D. candidates performed, or the Ph.D. candidates' day-to-day tasks on Keystone Nano-related projects; nor does Fraser allege that Keystone Nano maintained any employee records for the Penn State Ph.D. candidates performing work for the company. Accordingly, Fraser's FLSA claim against Keystone Nano fails on this theory as well.

programs, receive funding from either the university or an outside source—qualify as university "employees" under the FLSA such that they are covered by the law's minimum wage and hour requirements. That question does not lend itself to a bright-line rule, as the answer depends on the nature of both the work and the funding stream. But, generally speaking, FLSA protections do not extend to doctoral candidates. And here, they do not apply to Fraser.

Given the surprising paucity of prior legal rulings on the issue, the Court relies instead on the text of the statute as well as the agency rules and guidance relating thereto.[203] Specifically, Section 13(a)(1) of the FLSA provides that the statute's minimum wage and hour requirements do not apply to "any employee employed in a bona fide . . . professional capacity."[204] And United States Department of Labor ("DOL") regulations detail the types of workers who meet that standard, including "learned professionals" and "teachers."[205]

Although none of the DOL rules on "employee[s] employed in a bona fide professional capacity" specifically discusses student-employees such as graduate teaching assistants and research assistants, the DOL has issued guidance on the matter. In a Fact Sheet titled "Higher Education Institutions and Overtime Pay

---

[203] None of the parties directs the Court to any case law specifically addressing the issue of how doctoral candidates are treated under the FLSA, and the Court, through its research, has not found any.

[204] 29 U.S.C. § 213(a)(1).

[205] *See* 29 C.F.R. § 541.301 ("Learned professionals" exemption); 29 C.F.R. § 541.303 ("Teachers" exemption).

Under the [FLSA]," most recently revised in September 2019, the DOL instructs

that neither graduate teaching assistants nor research assistants are covered by the

FLSA's minimum wage and hours requirements, albeit for different reasons:

> **Graduate Teaching Assistants**. Graduate teaching assistants whose primary duty is teaching are exempt. Because they qualify for the teacher exemption, they are not subject to the salary basis and salary level tests.
>
> **Research Assistants**. Generally, an educational relationship exists when a graduate or undergraduate student performs research under a faculty member's supervision while obtaining a degree. Under these circumstances, the Department would not assert that an employment relationship exists with either the school or any grantor funding the student's research. This is true even though the student may receive a stipend for performing the research.[206]

The Court is not bound by the DOL's Fact Sheet,[207] but it finds the DOL

guidance persuasive.[208] For graduate teaching assistants, because Ph.D. candidates

serving in that capacity support university professors by assuming certain

---

[206] United States Department of Labor, *Fact Sheet #17S: Higher Education Institutions and Overtime Pay Under the Fair Labor Standards Act (FLSA)* (Revised Sept. 2019), https://www.dol.gov/agencies/whd/fact-sheets/17s-overtime-educational-institutions.

[207] *See Christensen v. Harris County*, 529 U.S. 576, 587 (2000) (informal agency guidelines are entitled to deference "only to the extent that [they] have the power to persuade"); *see also Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944) (explaining that informal agency "rulings, interpretations, and opinions . . . while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance"; "[t]he weight of such a judgment in a particular case will depend upon the thoroughness evident in its considerations, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade").

[208] *See Reich v. Parker Fire Protection Dist.*, 992 F.2d 1023, 1026–27 (10th Cir. 1993) (applying less deferential *Skidmore* standard to DOL Fact Sheet).

obligations associated with instructing a class,[209] they logically fit within the FLSA

exemption for "any employee with a primary duty of teaching, tutoring,

instructing, or lecturing in the activity of imparting knowledge and who is

employed and engaged in this activity as a teacher in an educational

establishment."[210] Indeed, the non-exhaustive list of professionals covered by the

teaching exemption found at 29 C.F.R. § 541.303(b) includes "teachers engaged in

automobile driving instruction" and "vocal or instrumental music instructors."

Surely, if the exemption applies to driving school and music instructors, it covers

graduate teaching assistants as well. Accordingly, although graduate teaching

assistants likely qualify as "employees" under the FLSA, they are not subject to the

law's minimum wage and hour requirements because they fall within an

enumerated exception.[211]

For graduate research assistants, the Court agrees with the DOL that to the

extent a Ph.D. candidate, in connection with her doctoral program, conducts

research under a professor's supervision, that research does not create an

employer-employee relationship. Rather, that research role should be understood as

a component of the candidate's doctoral studies.[212]

---

[209] For example, this is how Fraser describes his duties as a teaching assistant with Penn State's biology department: "teach the classes, keep office hours, respond to student emails, and grade assignments, tests, and papers." Doc. 33 (Am. Compl.) ¶ 25.

[210] 29 C.F.R. § 541.303(a).

[211] *See* 29 U.S.C. § 213(a)(1).

[212] Moreover, even if the funded graduate assistant research was sufficiently independent of the Ph.D. candidate's doctoral research to render it distinct from the candidate's academic

Against that backdrop, the Court finds that Fraser does not qualify as a non-exempt employee of Penn State under the FLSA. For the two academic years in which Fraser served as a teaching assistant (2015–16 and 2018–19),[213] he fell within the FLSA's exemption for teachers, rendering the law's minimum wage and hours requirements inapplicable.[214] For Fraser's two academic years funded by an NIH fellowship, the grant explicitly covered Fraser's thesis work.[215] And the stipend Fraser received from Dr. Read likewise pertained to his doctoral studies.[216] Accordingly, for the three years Fraser received funding for his research (unrelated to any teaching obligations), no employment relationship existed—with either Penn State or the NIH.[217]

To the extent Fraser believes the laboratory work unrelated to his dissertation that Dr. Paulson directed him to do somehow changes his employment relationship with Penn State, he is mistaken. By Fraser's own admission, that lab

---

program—thus, making the research role more akin to a graduate teaching assistant position—the Ph.D. candidate would likely be considered exempt under the "learned professionals" exemption. *See* 29 C.F.R. § 541.303. To fall under that exemption, an employee must "perform work requiring advanced knowledge" in a "field of science or learning" that is "customarily acquired by a prolonged course of specialized intellectual instruction." 29 C.F.R. § 541.303(a). Although it appears this exemption has yet to be applied to graduate research assistants, courts have found that the exemption covers post-doctoral research associates. *See Balyasnikova v. University of Illinois at Chicago*, 2007 WL 2669106 (N.D. Ill. Sept. 7, 2007). This Court sees no reason why the "learned professionals" exemption would apply to post-doctoral fellows performing independent research but not their pre-doctoral counterparts performing similar work.

[213] *See* Doc. 33 (Am. Compl.) ¶¶ 25, 34.
[214] *See* 29 C.F.R. § 541.303(a).
[215] *See* Doc. 33 (Am. Compl.) ¶¶ 28, 31.
[216] *See id.* ¶ 37.
[217] *See supra* n.206 (DOL Fact Sheet).

work was required as part of his doctoral Program: if he did not perform that work, "he would not have passed the Program."[218] Fraser may well believe that doctoral programs like the Molecular, Cellular, and Integrative Biosciences Program at Penn State should not require Ph.D. candidates to perform laboratory work at the direction of their thesis advisors that is unrelated to their respective dissertations. He may think that Ph.D. candidates should be permitted to conduct their doctoral work unencumbered by external demands or requirements. His frustrations do not, however, alter his employment status with Penn State as it relates to the FLSA.

Accordingly, Fraser's FLSA claim against Penn State is dismissed.

### C.    State Law Claims

Fraser brings seven additional claims arising under Pennsylvania state law.[219] The Court, however, need not address those claims at this juncture. Because Fraser's federal claims must be dismissed, the Court will decline to exercise supplemental jurisdiction over any state law claim.[220]

---

[218]   Doc. 33 (Am. Compl.) ¶¶ 40–42, 347–49, 389–91.

[219]   *See* Doc. 33 (Am. Compl.) ¶¶ 298–303 (Count V: Breach of Contract), 304–12 (Count VI: Breach of Implied Covenant of Good Faith and Fair Dealing), 313–20 (Count VII: Promissory Estoppel / Detrimental Reliance), 321–32 (Count VIII: Defamation *Per Se* and Defamation), 333–42 (Count IX: Violation of Pennsylvania Minimum Wage Act), 343–75 (Count X: Violation of Pennsylvania Wage Payment and Collection Law), 376–85 (Count XI: Beach of Implied Contract / Unjust Enrichment).

[220]   *See* 28 U.S.C. § 1367(c)(3); *see also United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966) (explaining general rule that if all federal claims are dismissed, courts should likewise dismiss pendent state-law claims).

## IV.   CONCLUSION

While pursuing his Ph.D. at Penn State, Fraser twice tried and failed to defend his doctoral thesis. Now, as a litigant in federal court, he has twice tried and failed to present a viable federal claim based on his unsuccessful thesis defenses and subsequent expulsion from his doctoral program. Fraser previously attempted to appeal his dismissal with the appropriate Penn State officials to no avail. Because further amendment of his claims here would be futile, Fraser's Amended Complaint is dismissed with prejudice; he is free to explore whether an appeal will fare better with the Third Circuit.

An appropriate Order follows.

BY THE COURT:


_s/ Matthew W. Brann_
Matthew W. Brann
Chief United States District Judge